**ALBRIGHT, STODDARD,**
**WARNICK & ALBRIGHT**
801 S Rancho Dr., Ste D4
Las Vegas, Nevada 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
Email: gma@albrightstoddard.com

*Liaison Counsel for the Class*

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS, ESQ.*
JAKE BISSELL-LINSK, ESQ.*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
Jbissell-linsk@labaton.com

*Admitted pro hac vice

*Attorneys for Lead Plaintiffs ODS Capital LLC*
*and Nantahala Capital Management, LLC, and*
*Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE DIAMOND RESORTS INTERNATIONAL, INC. SECURITIES LITIGATION | CLASS ACTION<br><br>Civil Action No. 2:18-cv-01355-APG-CWH<br><br>LEAD PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Jury Trial Demanded |

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

i

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................ 5

II.     JURISDICTION AND VENUE ........................................................................ 15

III.    PARTIES AND OTHER KEY ACTORS ......................................................... 16

        A.     Lead Plaintiffs ...................................................................................... 16

        B.     Defendants ............................................................................................ 16

        C.     Other Key Actors ................................................................................. 20

IV.     CONTROL PERSON ALLEGATIONS ........................................................... 20

V.      SUBSTANTIVE ALLEGATIONS .................................................................. 22

        A.     Overview of Diamond's Business ........................................................ 22

               1.     Vacation Interest Sales and Financing ...................................... 23

               2.     Hospitality and Management Services ........................................ 24

        B.     The Value of Diamond Stock Falls as Investors Short the Company ................... 24

        C.     Apollo Approaches Diamond Regarding a Strategic Transaction and
               Diamond Announces that it is Exploring a Sale ................................... 27

        D.     Incentives and Conflicts Motivate and Taint the Strategic Review Process ........ 30

               1.     Defendants Cloobeck and Palmer and Mr. Kraff Needed to
                      Announce a Transaction by July 2016 in Order to Cash In Their Call
                      Options ........................................................................................ 30

               2.     Members of the Strategic Review Committee Were Conflicted Due
                      to Relationships With Apollo ..................................................... 32

        E.     The Strategic Review Committee Conducts a Hasty Sale process ....................... 34

               1.     Centerview Solicits Interest in the Transaction ........................ 34

               2.     Interested Parties Were Rushed to Make Final Bids ................. 34

               3.     Apollo's Offer is Accepted by Diamond's Board, Except Defendant
                      Cloobeck who Opposed the Transaction .................................... 36

        F.     Diamond Announced Proposed Transaction with Apollo ..................... 38

        G.     Apollo Makes the Tender Offer and Diamond Issues the Recommendation
               Statement ............................................................................................... 39

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1.   Description of the Board's Voting ........................................................ 40

2.   Recommendation that Shareholders Approve the Transaction ................. 41

3.   Centerview's Fairness Opinion ........................................................ 42

4.   Directors' Decision Making Process ...................................... 43

5.   Employment and Consulting Agreements ................................. 45

6.   Plans to Tender Shares ........................................................ 45

7.   Appraisal Rights ........................................................ 45

H.   Apollo's Tender Offer Lacked Adequate Investor Support Until Defendant Cloobeck Tendered His Shares While Securing a Consulting Position from Apollo ........................................................ 46

I.   Apollo Completes Acquisition of Diamond ........................................................ 49

J.   Related Litigation ........................................................ 51

1.   Shareholders Seek Appraisal ........................................................ 51

2.   Breach of Fiduciary Duties Suit ........................................................ 53

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................. 56

A.   Cloobeck's Opposition to the Merger ........................................................ 57

1.   Statements on June 29, 2016 ........................................................ 57

2.   Statements on July 14, 2016 ........................................................ 59

B.   Reasons for Approving the Transaction ........................................................ 60

C.   Defendant Cloobeck's Decision to Tender His Shares ................................. 63

D.   Defendant Cloobeck's Consulting Agreement ........................................................ 64

E.   Centerview's Earlier DCF Analysis ........................................................ 66

F.   Apollo Approached Diamond About a Transaction ................................. 67

VII.   ADDITIONAL ALLEGATIONS REGARDING OMISSIONS .................................. 67

VIII.   ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER ........... 68

A.   Defendant Cloobeck's Opposition to the Transaction and the Board's Purported Reasons for Approving the Transaction ................................. 68

B.   Centerview's Earlier DCF Analysis ........................................................ 69

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

iii

C.     Apollo Approaching Diamond .................................................... 70

D.     Defendant Cloobeck's Acceptance of the Tender Offer ....................... 71

E.     Defendant Cloobeck's Consulting Position ..................................... 71

F.     Several of the Defendants had the Motive and Opportunity to Defraud Investors ......................................................................... 72

      1.     Defendant Cloobeck ....................................................... 72

      2.     Defendant Palmer .......................................................... 73

      3.     Defendant Taitz ............................................................ 73

      4.     Defendant Jones ............................................................ 74

IX.     LOSS CAUSATION ........................................................................ 74

X.     APPLICATION OF THE PRESUMPTION OF RELIANCE ........................... 76

XI.     NO SAFE HARBOR ....................................................................... 77

XII.     CLASS ACTION ALLEGATIONS ...................................................... 78

COUNT I Violation of § 14(e) of the Exchange Act  Against Defendants Diamond, Berkman,  Cloobeck, Daley, Del Papa, Jones,  Palmer,  Taitz, Warren, and Wolf Based on Negligence ........................................................................................ 81

COUNT II Violation of § 14(e) of the Exchange Act  Against All Defendants Based on Scienter .......................................................................................... 82

COUNT III Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ....................................................... 84

COUNT IV Violation of § 20(a) of the Exchange Act  Against All Individual Defendants ......... 85

XIII.     PRAYER FOR RELIEF ................................................................. 86

XIV.     JURY DEMAND ......................................................................... 87

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

By and through its undersigned counsel, ODS Capital LLC and Nantahala Capital Management, LLC (each a "Lead Plaintiff," and together "Lead Plaintiffs") bring this complaint individually and on behalf of a class of former owners of Diamond Resorts International Inc.'s ("Diamond" or the "Company") publicly traded common stock (defined as the Class in Section XII below). Lead Plaintiffs allege the following upon personal knowledge as to those allegations concerning Lead Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Diamond with the U.S. Securities and Exchange Commission ("SEC")[1]; (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles; (d) interviews with former employees of Diamond, its affiliates, and other third parties; (e) review of the publicly available documents from other litigation involving Diamond; and (f) consultation with individuals with expertise in accounting and damages. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will be revealed after Lead Plaintiffs have a reasonable opportunity to conduct discovery.

Lead Plaintiffs allege the following against Defendants David J. Berkman, Stephen J. Cloobeck, Richard M. Daley, Jared T. Finkelstein, Frankie Sue Del Papa, Jeffrey W. Jones, David F. Palmer, Hope S. Taitz, Zachary D. Warren, and Robert Wolf (collectively the "Individual Defendants") and against Diamond (together with the Individual Defendants, the "Defendants").

## I.   NATURE OF THE ACTION

1.   During the Class Period, the Defendants misled Diamond's shareholders into selling their shares for less than the true value[2] of those shares by withholding material

---

[1] Diamond's June 29, 2016, SEC filings on forms 8-K and 14D-9, Diamond's July 14, 2016, SEC filings on Forms 14D-9 and the subsequent amendments thereto on August 9, 2016, August 24, 2016, August 29, 2016, and September 2, 2016, are all incorporated by reference.

[2] The terms "true value" or "fair value," as used herein, refers to the actual value of owning Diamond stock as measured by either the value shareholders could have received through an adequate sale process or the intrinsic value of owning the equity stake in Diamond, a valuable going concern enterprise, that such shares represented. Investors do not have an absolute right to receive the true value of their shares from a

information related to Diamond's proposed going private transaction (the "Transaction"). Through the $2.2 billion Transaction, the private equity firm Apollo Global Management, LLC ("Apollo") acquired Diamond at a deep discount while many of Diamond's key decision makers received significant personal benefits, including remarkably timed stock-option executions, secret "consulting" payments and hundreds of millions of dollars in proceeds from the sale.

2. The Transaction was completed on September 2, 2016 at a price of $30.25 per share. However, Defendants withheld from the market that the Chairman of the Board, Defendant Stephen J. Cloobeck ("Cloobeck"), who was also the founder of Diamond and its former CEO, was vehemently opposed to the deal because he did not think the deal price was fair. However, in order to get the deal done in the face of lackluster support from non-insider shareholders, Apollo needed Defendant Cloobeck to tender his shares. So, Apollo offered Defendant Cloobeck a lucrative consulting deal, and Defendant Cloobeck tendered his 18% ownership in the Company to make the deal happen. Both the fact that Defendant Cloobeck had a consulting deal and the fact that he agreed to tender his shares were withheld from the market. Defendants also withheld from the market that Apollo approached Diamond before the Company announced the formation of the Strategic Review Committee seeking purchasers of Diamond, which downplayed Apollo's interest in Diamond and hid the fact that Apollo had a head start over other potential purchasers of the Company. Finally, Defendants hid that earlier that year Diamond's investment bank, Centerview Partners LLC ("Centerview"), conducted a valuation of Diamond that indicated its shares were worth between $39.85 to $53.50 – yet after Apollo submitted its final bid, Centerview (who had other relationships with Apollo) reduced their valuation to a range of $30.25 to $45.20; the very low end of that range was the exact price of Apollo's offer. The market only knew about this lower valuation range. These omissions caused Plaintiffs to suffer damages because they were deprived of the true value of their shares.

purchaser, but where they have been misled into selling their shares, the most appropriate remedy is

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

3.      Diamond was a timeshare and resort management company.  It was founded in 2007 by Defendant Cloobeck, who remained its CEO until the Company's initial public offering ("IPO") on the New York Stock Exchange ("NYSE") in 2013.  Defendant Cloobeck has acknowledged that the timeshare industry had developed a negative reputation for aggressive sales tactics but as he argued in his recent book *Checking In: Hospitality-Driven Thinking, Business, and You*, he sought to "remake timeshare in [Diamond's] own image," which he said, rested on integrity, directness, and customer appreciation.

4.      Following its IPO in 2013, Diamond was highly successful at growing its business. From 2013 to 2014, Diamond went from losing money to posting $59 million in profits, while growing revenue from $730 million to $845 million.  Furthermore, the price of Diamond stock more than doubled, increasing from its IPO price of $14 to a peak of $32.18 in the first quarter of 2015.

5.      However, Diamond also became a major target for short sellers—and closed out the first quarter of 2015 with a short interest ratio of about 13%.[3]  Some of these short sellers published articles and made presentations arguing that Diamond was an unsustainable enterprise that depended on swindling consumers through high pressure sales tactics, and that eventually consumers would smarten up or regulators would clamp down on the Company's sales practices. Of course, not all shareholders held this view—many remained "long" on Diamond.

6.      The price of Diamond stock declined and closed out 2015 at a price of $25.51, a drop of 26% from its peak of $32.18 in the first quarter that same year.  This significant decline was striking, particularly given that the Company continued to post impressive financial results. Throughout the year, Diamond's revenue grew 13% to $954 million and its profits increased by 251% to $149 million.  The disconnect between performance and share price was exacerbated by

damages equal to the difference between the sale price and true value.
[3] Short selling is a practice of betting against a company.  It has the economic effect of selling borrowed shares, with the goal of repurchasing them at a reduced price, before they need to be returned to their

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
LAW OFFICES
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

the tremendous short interest in Diamond, which grew to 28% by the end of 2015.  The market average was approximately 5%.

7.      In the spring of 2015, Diamond's board of directors (the "Board") formed a committee and hired Centerview to explore possible strategic transactions to maximize shareholder value.  However, Diamond decided against a transaction and disbanded the committee in September 2015, without ever publicly announcing the formation of the committee.

8.      Just a few months later, on January 16, 2016, David Sambur ("Sambur"), a senior partner at Apollo, approached Diamond's management team regarding a potential transaction.  On that same day, Centerview presented a slide deck regarding Diamond's value—which included a discounted cash flow[4] analysis estimating Diamond's intrinsic value to be between $39.85 to $53.50 a share.

9.      Later in January, the Vice Chairman of Diamond's Board, Lowell D. Kraff ("Kraff"), texted the Company's CEO, Defendant David F. Palmer ("Palmer"), saying "[w]e have to get this private before July," to which Defendant Palmer responded, "[o]r at least announce a deal."  This message was an obvious reference to the fact that both of these directors, along with Defendant Cloobeck, beneficially owned a large number of call options (the "Call Options"), which were set to expire in July.  Therefore, these directors had a strong incentive to announce a transaction before the expiration of their options, because such an announcement would almost certainly (at least temporarily) increase the price of Diamond stock and increase the value of their call options.

10.      On February 24, 2016, without disclosing that Apollo had already approached the Company about a potential transaction, Diamond announced that it had formed a new committee (the "Strategic Review Committee") to explore possible strategic transactions.  In the related press

owner.  The short interest ratio is equal to the number of shares outstanding divided by the number of shares borrowed by short sellers.  Short selling may drive down a Company's share price.

release, Defendant Palmer stated that this decision was motivated by a "dislocation" between the market price and the fair value of Diamond stock. The market reacted positively, with stock prices closing up 21.45% at $23.21.

11.     The Strategic Review Committee was composed of Defendants David J. Berkman ("Berkman"), Jeffrey W. Jones ("Jones"), Robert Wolf ("Wolf") and Hope S. Taitz ("Taitz"), with Defendants Taitz and Wolf serving as co-chairs. From the beginning, Diamond's Strategic Review Committee and the deal process were riddled with conflicts. Defendant Taitz had long-standing personal and business ties with Apollo's two co-founders. She went to business school with them at Wharton, worked on the M&A desk with them at Drexel Burnham Lambert, patronized their charities, and served on the boards of **twelve** companies affiliated with Apollo—which was very lucrative to Defendant Taitz personally.[5]

12.     There is no question that Defendant Taitz was conflicted and aligned with Apollo and, in the Delaware Litigation,[6] her own lawyer admitted that she was conflicted. Another of the committee's members, Defendant Jones, was also conflicted, since he had served as CFO of two Apollo owned companies from 1999 to 2012. Thus, two out of the four committee members charged with analyzing and negotiating strategic transactions to maximize the value of Diamond stock were instead closely aligned with Apollo.

13.     Adding yet another conflict to the deal process, on March 9, 2016, the Strategic Review Committee retained Centerview to provide it with investment banking services.

---

[4] A discounted cash flow ("DCF") analysis is a traditional valuation methodology that looks at the predicted future net income of the company to calculate its estimated present value. Many courts regard DCF as a useful tool for understanding the intrinsic value of an enterprise.

[5] In 2015, Taitz received more than $200,000 in compensation from her board position with Athene Holding Ltd. Compensation information for Taitz' additional eleven board positions with Apollo-affiliated entities is not publicly available. She received over $600,000 in 2015 compensation from Diamond. Using these two companies as a benchmark, Taitz total compensation from Apollo-affiliated entities could easily have exceeded a million dollar per year.

[6] Reference made throughout to "the Delaware Litigation" refers to the lawsuits described in Section V(J). The Delaware Litigation was filed *after* the closing of the Transaction and therefore, anything described as first being disclosed in the Delaware Litigation refers to information that was not publicly disclosed during the Class Period.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Centerview was also conflicted—though to a lesser degree than Defendant Taitz—as it had a history of working on deals with companies affiliated with Apollo including Caesars Entertainment Corporation and Hexion, Inc.

14.    Acting as Diamond's investment banker, Centerview solicited interest from other potential acquirers. A diligence process was commenced, and the Strategic Review Committee met several times to discuss the sale process. During the week of April 25, 2016, five companies submitted indications of interest—ranging from $23 to $33 per share. Upon receipt of these indications of interest the Strategic Review Committee determined to proceed with the sale process, which would include presentations to the bidders and exchanging additional diligence materials.

15.    Defendant Cloobeck's opposition to the deal was apparent and vocal.[7] On May 14, 2016, Defendant Cloobeck wrote to Defendant Taitz stating that he had "bought and sold many companies" and that he "wouldn't do this." Nevertheless, the sale process continued, and on May 27, 2016, after several additional steps in the sale process, Centerview informed the potential acquirers that they would need to make final bids by June 23, 2016. In anticipation of the receipt of final bids – including a final bid from Apollo, Defendant Taitz recused herself from the Strategic Review Committee "in light of her" positions on Apollo affiliated Boards. However, Defendant Taitz continued to be involved in the process and deliberated and voted as a member of the Board.

16.    Only two interested parties met the June 23, 2016, deadline: Apollo bid $30.25 and Reverence Capital Partners ("Reverence Capital") bid $27-29. However, Reverence Capital had previously indicated interest at $28-33 and, at the time of submitting its final bid of $27-29, it requested an additional 30-45 days to complete diligence. Allowing this delay would have pushed

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

---

[7] As used throughout, references to Defendant Cloobeck's "vocal" opposition refer to the fact that, at the very least, he vocalized his opposition in two Board meetings and to Defendant Taitz in an email. His opposition was not described to the public until the Delaware Litigation.

the announcement of a deal out until after the expiration of Defendant Palmer, Defendant

Cloobeck, and Mr. Kraff's Call Options.

17.     On June 23 and June 24, the Strategic Review Committee met to discuss the bids

and Centerview's valuation of Diamond.  The committee recommended that the Board direct

Centerview to solicit best and final bids, and the Board did so.  Apollo declined to increase its bid

and Reverence Capital indicated that it needed more time for diligence before offering a best and

final bid.

18.     On June 25, 2016, the Board met again to discuss the bids.  It is now known, but

**was not disclosed during the Class Period**, that Defendant Cloobeck vocally opposed the proposal

at this meeting by telling the Board that he was:

> [D]isappointed with the price and the Company's management for
> not having **run the business** in a manner that would command a
> higher price, and that in his View, it was not the right time to sell the
> Company.

19.     While Defendant Cloobeck abstained from the vote, the remainder of the Board

authorized Centerview to negotiate a merger agreement with Apollo.  The next day, on June 26,

2016, Centerview provided the Company with its analysis, including a DCF analysis that it

performed using forecasts provided by Diamond's management that valued the Company at

$30.25 to $45.20 per share, far lower than the valuation it presented in January at $39.85 to

$53.50. This drop was inexplicable—the Company's financial performance had continued to

improve between the two valuations and the Company had posted another two quarters of record

performance.  Conspicuously, Apollo's offer was at the *exact* bottom of this new lower range.

20.     On June 26, 2016, the Board met once again to review the final merger agreement.

Once again Defendant Cloobeck vocally opposed the proposal—and the minute entry recorded his

opposition in identical language to that describing his June 25, 2016, statements.  He once again

abstained from the vote and the other Board members voted to approve the Transaction.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
LAW OFFICES
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

21.     The first day of the Class Period is June 29, 2016.  On that day, Diamond and Apollo issued a joint press release announcing the deal, its price, and the terms of the merger agreement.  In a public filings made by Diamond that day, Defendant Palmer stated: "we are pleased to announce that we have entered into a merger."  Additionally, filing stated that the Board approved the merger agreement and that the Board recommends that shareholders accept the deal.  The price of Diamond stock increased 23.8% that day, to close at $29.79.

22.     However, the Transaction would only go forward upon shareholder approval. Apollo sought this approval by making a tender offer to buy Diamond stock at $30.25 per share (the "Tender Offer").  Apollo needed to convince more than 50% of outstanding shares to accept the tender offer in order to satisfy the requirement of shareholder approval under Section 251 of the Delaware General Corporate Law.  Because insiders owned only 26% of the Company, Apollo needed outside shareholders to also bless the deal in order for the deal to close.

23.     On July 14, 2016, Apollo formally made the Tender Offer and Diamond published its Recommendation Statement with the SEC on form 14D-9, which recommended that shareholders tender their shares and thereby approving the Transaction.  The Recommendation Statement purportedly described the Transaction negotiation process, the terms of the deal, and the reasons for the Board's recommendation.  The Recommendation Statement disclosed that Defendant Cloobeck abstained from the Board's vote on the Transaction but *did not disclose why he abstained or his vocal, strong and repeated opposition to the Transaction*.  The gravity of this omission is emphasized by the fact that just months earlier Diamond's 2016 Proxy solicitation had boasted of Defendant Cloobeck's "unique understanding" and "in-depth knowledge" of Diamond, and the industry as a whole, derived from his "30 years of experience in the vacation ownership industry and his service as [Diamond's] founder and former Chief Executive Officer."

24.     Furthermore, the Recommendation Statement made various statements that were rendered materially misleading due to this omission.  For example, it was materially misleading

- 12 -

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    for the Recommendation Statement to assert that the Board "determined" that the "alternatives to a

2    sale" were "less favorable to the Company's stockholders than the Transaction," without also

3    disclosing the fact that Defendant Cloobeck had shared his view with the Board that the exact

4    opposite was true, and that Centerview's earlier, much higher, DCF valuation of the Company

5    supported Defendant Cloobeck's view.  In fact, Defendant Cloobeck stated it was a bad time to

6    sell and that mismanagement had negatively affected the stock price.  As the Delaware Supreme

7    Court held in the Delaware Litigation, in a case brought after the Class Period ended, this

8    purported reason for shareholders to tender their shares was "directly at odds" with Defendant

9    Cloobeck's view and the representation to stockholders that they would "receive a fair price in the

10   merger" was "materially misleading" without the "additional simultaneous tempering disclosure"

11   of Defendant Cloobeck's views.[8]

12

13         25.    The Recommendation Statement also materially misstated certain aspects of the

14   sale process—such as misrepresenting the timing of Apollo's interest in the Transaction and

15   omitting any discussion of the earlier DCF analysis performed by Centerview in January 2016,

16   which had valued Diamond well-above the deal price.

17         26.    Shortly after the publication of the Recommendation Statement, on July 18, 2016,

18   Defendant Cloobeck emailed Mr. Sambur at Apollo inquiring if Apollo wanted to hire him.  The

19   Tender Offer was initially set to expire on August 10, 2016, and as of August 9, 2016, only 27.9%

20   of shares – which included 8.1% of the insiders' shares – had agreed to tender.  Shareholders did

21   not love the proposed Transaction.  Given the lack of interest by shareholders, and in order to

22   make sure the deal had a chance of going through, Diamond needed Defendant Cloobeck to tender

23   his shares.  Defendant Cloobeck again reached out to Apollo—informing them of the current vote

24

25

26   [8] *Appel v. Berkman*, 180 A.3d 1055, 1057 (Del. 2018).  This case and a Delaware appraisal action,
     *Empyrean Capital Fund LP v. Diamond Resorts, Int'l, Inc.*, No. 12759 (Del. Ch. filed Sept. 20, 2016),
27   related to the Transaction are discussed in Section V(J).  The public records of both actions are
     incorporated by reference herein.  As noted earlier, these cases are referred to herein as the Delaware
28   Litigation and were filed after the Class Period, such that the facts revealed therein were not known to
     investors during the class period.

- 13 -

total—and on August 9, 2016, Apollo extended the Tender Offer for another ten business days. This required Diamond to file an amendment to its Recommendation Statement updating the expiration date and noting the vote total.

27.     On August 17, 2016, Defendant Cloobeck finally tendered his shares and tipped the total number of total shares in favor of the Tender Offer to just over 50%. Not coincidentally, on August 31, 2016, Mr. Sambur, of Apollo, confirmed with another Apollo employee by email that Apollo was bringing Defendant Cloobeck on as a "consultant." Furthermore, a former high level employee of the Company explained that Defendant Cloobeck was being paid several hundred thousand dollars a month for his work as a consultant in 2017. This former employee explained that this expense was categorized as an M&A related expense—not because Defendant Cloobeck was an M&A consultant—but because these fees were a cost Diamond incurred as part of M&A activity. The overwhelmingly clear conclusion from this fact is that Defendant Cloobeck had been paid to tender his shares and the consideration for that payment was in the form of post-Transaction consulting fees. None of these facts were known to investors.

28.     Despite now having sufficient shares to execute the Transaction, Apollo extended the Transaction on August 24, 2016 and again on August 29, 2016. Following each of these extensions, Diamond amended its Recommendation Statement. Neither of these amendments disclosed that Defendant Cloobeck had tendered his shares or that he was hired as a consultant.

29.     In contravention to its disclosure duties, Diamond never revealed that (1) Apollo approached Diamond in January 2016, (2) Centerview's higher DCF analysis; (3) Defendant Cloobeck's vocal opposition to the Transaction; (4) Defendant Cloobeck's eventual decision to tender his shares; or (5) Defendant Cloobeck's consulting agreement.

30.     After multiple extensions, the Tender Offer was finally allowed to expire on September 1, 2016. The following day the Transaction was completed. On that day, Defendant

1   Cloobeck sent an internal email to a Diamond employee indicating he would remain with the

2   Company as a consultant.

3       31.     As a result of the deal, and in addition to receiving a lucrative consulting deal,

4   Defendant Cloobeck made at least $382 million in proceeds from the deal.  Defendant Palmer

5   made at least $149 million in proceeds and was also handed a lucrative consulting deal and a $12

6   million golden parachute.

7       32.     Meanwhile, Lead Plaintiffs and members of the Class were injured as a result of

8   selling their shares for less than their true value.  The fair value of Diamond stock—whether

9   measured in relation to the Company's intrinsic value or as measured in relation to the price

10  shareholders would have received through a fair transaction—far exceeded the $30.25 deal price.

11

12  **II.    JURISDICTION AND VENUE**

13      33.     This complaint alleges claims which arise under the following provisions of the

14  Securities Exchange Act and rules regulating securities: (1) Section 14(e) of the Securities

15  Exchange Act of 1934, 15 U.S.C. § 78n(e); (2) Section 10(b) of the Exchange Act, 15 U.S.C. §

16  78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and (3)

17  Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

18      34.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of

19  the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  During the Class Period, Diamond

20  was incorporated in the state of Delaware, listed its stock on the NYSE, and maintained its global

21  corporate headquarters in Las Vegas, Nevada.  During the Class Period, each of the Individual

22  Defendants were directors or senior management of Diamond.

23

24      35.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act,

25  15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Diamond maintained its global corporate

26  headquarters in Las Vegas, Nevada—these headquarters are also Diamond's executive offices.

27

28

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   During the Class Period, each of the Individual Defendants were directors or senior management

2   of Diamond.

3       36.     In connection with the acts alleged in this Complaint, Defendants, directly or

4   indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

5   to, the mails, interstate telephone communications, and the facilities of the NYSE.

6   **III.    PARTIES AND OTHER KEY ACTORS**

7       **A.    Lead Plaintiffs**

8       37.     Lead Plaintiff ODS Capital LLC ("ODS Capital") is a Florida limited liability

9   company with its primary office and business address in Jupiter, Florida.  As set forth in its

10  PSLRA certification (*see* ECF No. 14-3), ODS Capital sold Diamond stock during the Class

11
12  Period and suffered damages as a result of the securities law violations alleged herein.

13      38.     Lead Plaintiff Nantahala Capital Management, LLC ("Nantahala Capital") is a

14  Registered Investment Adviser[9] that manages private hedge funds and separate accounts based out

15  of Darien, Connecticut.  Through two private funds under Nantahala Capital's management,

16  Nantahala Capital Partners Limited Partnership and Nantahala Capital Partners II Limited

17  Partnership, and as set forth in its PSLRA certification (*see* ECF No. 14-3), Nantahala Capital sold

18  Diamond stock during the Class Period and suffered damages as a result of the securities law

19  violations alleged herein.

20      39.     ODS Capital and Nantahala Capital collectively manage more than $1.6 billion in

21  total assets, and possess the capability, resources, and experience to oversee this complex

22
23  litigation.

24      **B.    Defendants**

25      40.     During the Class Period, Defendant Diamond was a publicly traded company,

26  incorporated in Delaware with headquarters in Las Vegas, Nevada.  Diamond described itself as a

27
28  _____
    [9] This designation means that Nantahala Capital is registered with the SEC, but such registration does not denote any level of skill or training.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

global leader in the hospitality and vacation ownership industry and, as of its 2015 Annual Report,[10] it operated a resort network of 379 vacation destinations located in 35 countries. Diamond was a timeshare company that made money by selling and financing Vacation Ownership Interests ("VOIs") to consumers and through the receipt of fees associated with its hospitality and management services. Through the Transaction, Diamond was merged into an entity controlled by Apollo, and after the Transaction closed on September 2, 2016, has been privately owned and controlled by Apollo.

41.    Defendant David J. Berkman ("Berkman") served as a Diamond director from 2013 until September 2, 2016, on which date the Transaction was consummated. Defendant Berkman was a member of Diamond's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. The Audit Committee, among other things, selects the independent auditors, and reviews the results and scope of the audit performed by the auditors. Service on the Audit Committee would give a Board member significant exposure to the Company's financial condition. The Compensation Committee has the primary responsibility for a range of issues regarding compensation. The Nominating and Corporate Governance Committee has the primary responsibility of advising the Board with respect to Board composition, procedures and committees. Defendant Berkman was also a member of the Strategic Review Committee that negotiated and recommended the Board accept the Transaction. Defendant Berkman owned 101,538 shares of Diamond stock as of July 13, 2016.

42.    Defendant Stephen J. Cloobeck ("Cloobeck") is Diamond's founder and served as Chairman of the Board from the Company's inception until the consummation of the Transaction on September 2, 2016. Defendant Cloobeck served as Diamond LLC's CEO from April 2007 through December 2012. As of July 13, 2016, Defendant Cloobeck beneficially owned 12,629,387 Diamond shares out of a total of 69,745,698 shares—meaning that he owned

[10] Filed with the SEC on February 29, 2016.

- 17 -

approximately 18% of Diamond's outstanding stock.  Defendant Cloobeck was at all times prior to the Transaction, Diamond's largest shareholder.

43.     Defendant Richard M. Daley ("Daley") served as a Diamond director from the Company's IPO in July 2013 until the consummation of the Transaction on September 2, 2016.  Defendant Daley was a member of Nominating and Corporate Governance Committee.  Defendant Daley owned 24,024 shares of Diamond stock as of July 13, 2016.

44.     Defendant Frankie Sue Del Papa ("Del Papa") served as a Diamond director from May 2016 until the consummation of the Transaction on September 2, 2016.  Defendant Del Papa did not own any Diamond stock as of July 13, 2016.

45.     Defendant Jared T. Finkelstein ("Finkelstein") was a Senior Vice President at Diamond filling the General Counsel and Corporate Secretary roles.  Beginning in December 2012, he was a Senior Vice President in Diamond's legal department, and in July 2014, took the role of General Counsel and Corporate Secretary.  On his public LinkedIn page, he describes himself as a "hands-on general counsel."

46.     Defendant Jeffrey W. Jones ("Jones") served as a Diamond director from 2015 until the consummation of the Transaction on September 2, 2016.  Defendant Jones was a member of Diamond's Audit Committee and Compensation Committee.   Defendant Jones was also a member of the Strategic Review Committee that negotiated and recommended the Board accept the Transaction.  Defendant Jones owned 3,824 shares of Diamond stock as of July 13, 2016.  Prior to serving on Diamond's Board, Defendant Jones was CFO of two Apollo affiliated Companies: Vail Resorts, Inc. and Clark Enterprise Inc.  Roughly a year after the Transaction was completed, Apollo acquired ClubCorp Holdings, Inc. ("ClubCorp") and appointed Defendant Jones to its board of directors.

47.     Defendant David F. Palmer ("Palmer") has served as the Company's President and Chief Executive Officer ("CEO"), and as a member of the Diamond Board, since the Company's

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    inception in January 2013 until the consummation of the Transaction on September 2, 2016.

2    Following consummation of the Merger, Palmer continued to serve as the Company's President

3    and CEO until December 31, 2016. According to a Company press release, he continued to

4    "support Diamond Resorts . . . through an advisory role" in 2017. Defendant Palmer owned

5    4,932,436 shares of Diamond stock as of July 13, 2016.

6         48.    Defendant Hope S. Taitz ("Taitz") served as a Diamond director from August 2013

7    until the consummation of the Transaction on September 2, 2016. Defendant Taitz was a member

8    of Diamond's Audit Committee, Compensation Committee, and Nominating and Corporate

9    Governance Committee. Defendant Taitz was also a member of the Strategic Review Committee

10   that negotiated and recommended the Board accept the Transaction. As of July 13, 2016,

11   Defendant Taitz held 20,842 shares of Diamond stock. According to Diamond's 2016 Proxy

12   Statement,[11] Taitz serves as a director at MidCap FinCo Holdings Limited, MidCap FinCo

13   Limited, MidCap Funding I (Ireland) Limited, MidCap FinCo Intermediate Holdings Ltd, Apollo

14   Residential Mortgage, Inc., Athene USA Corporation, Athene Annuity and Life Company, Athene

15   Life Insurance Company of New York, Athene Annuity and Life Assurance Company of New

16   York, Athene Annuity & Life Assurance Company, Athene Life Re Ltd. and Athene Holding Ltd.,

17   all of which are affiliates of Apollo.

18        49.    Defendant Zachary D. Warren ("Warren") served as a Diamond director from the

19   Company's inception in January 2013 until the consummation of the Transaction on September 2,

20   2016. As of July 13, 2016, Defendant Warren held 21,570 shares of Diamond stock.

21        50.    Defendant Robert Wolf ("Wolf") served as a Diamond director from the

22   Company's IPO in July 2013 until the consummation of the Transaction on September 2, 2016.

23   Defendant Wolf was a member of Diamond's Compensation Committee and Nominating and

24   Corporate Governance Committee. Defendant Wolf was also a member of the Strategic Review

1  Committee that negotiated and recommended the Board accept the Transaction. As of July 13,

2  2016, Defendant Taitz held 31,496 shares of Diamond stock.

3      **C.    Other Key Actors**

4      51.    Lowell D. Kraff ("Kraff") served on Diamond's predecessor's board and on

5  Diamond's Board from the Company's inception until his resignation on May 24, 2016. He

6  served as Vice-Chairman of the Board from January 2013 until his resignation. The Company's

7  2013 Proxy Statement explained that he has a background in private equity. He co-founded

8  Vision Capital Partners, LLC, with Defendant Palmer in 1996 and stayed with that firm until co-

9  founding Trivergance LLC with Defendant Palmer in June 2006.

10      52.    Apollo Global Management, LLC is a publicly traded private equity fund with over

11  $270 billion under management. It was founded in 1990 by three former employees of Drexel

12  Burnham Lambert Inc.'s Mergers and Acquisitions group. The founders were Leon Black, Josh

13  Harris, and Marc Rowan. Through the Transaction, Dakota Merger Sub, Inc., which was a wholly

14  owned subsidiary of Dakota Parent, Inc., merged into Diamond, wherein the surviving entity was

15  known as Diamond Resorts International Inc., and at all times Dakota Merger Sub, Inc., and

16  Dakota Parent, Inc., were wholly owned by funds managed by Apollo Management VIII, L.P., an

17  affiliate of Apollo. As used herein, the term "Apollo" includes Apollo Management VIII, L.P.,

18  Dakota Parent, Inc., and all other affiliates of Apollo.

19      53.    Centerview Partners LLC is an investment banking and advisory firm that

20  consulted with Diamond, the Strategic Review Committee, and the Board regarding the

21  Transaction. Centerview had previously worked on deals with Apollo affiliated entities.

**IV.    CONTROL PERSON ALLEGATIONS**

    54.    The Individual Defendants, by virtue of their senior positions at Diamond, directly

participated in the management of the Company, were directly involved in the day-to-day

---

[11] Filed with the SEC on April 15, 2016, in connection with the Company's 2016 annual meeting of stockholders.

- 20 -

operations of the Company at the highest levels, and were privy to confidential, proprietary

information concerning the Company and its business, operations, growth, financial statements,

and financial condition, as alleged herein.  As set forth below, the distribution of misleading

information and the failure to convey material information to the public was the result of their

collective actions and inactions.

55.     Each of the Individual Defendants, except Defendant Finkelstein and Defendant

Del Papa, signed Diamond's 2015 Annual Report on February 29, 2016, and Defendant Palmer

signed the accompanying certification pursuant to the Sarbanes Oxley Act of 2002 ("SOX").

Defendant Finkelstein has signed over a dozen of Diamond's SEC filings.

56.     On February 22, 2016, Defendants Berkman, Jones, Wolf and Taitz were appointed

to the Strategic Review Committee to explore possible strategic transactions for Diamond.

Defendants Taitz and Wolf were appointed as co-chairs of that committee.  That committee was

responsible for negotiating potential strategic transactions on behalf of Diamond and ultimately

negotiated the Transaction with Apollo.  On June 23, 2016, just two days before Apollo submitted

its final bid for Diamond and after all due diligence and substantive negotiations between Apollo

and Diamond had been completed, Defendant Taitz recused herself from the Strategic Review

Committee due to her conflicted relationships with Apollo.  However, Taitz stayed on the Board

and remained involved in deliberations and votes regarding the Transaction.

57.     On June 25, 2016, each of the Individual Defendants participated in a meeting to

discuss the merger—including Defendant Taitz.  Each of the Individual Defendants, except

Defendant Cloobeck, authorized the legal and financial advisors to negotiate a final merger

agreement with Apollo.  Defendant Cloobeck voiced his opposition to the proposal and abstained

from voting.  On June 26, 2016, each of the Individual Defendants participated in a meeting

wherein the Board, (except for Defendant Cloobeck, who abstained after voicing his opposition to

the Transaction), approved Diamond's entry into a merger agreement with Apollo.  On June 28,

2016, each of the Individual Defendants participated in a meeting wherein the Board members,

(except for Defendant Cloobeck who again abstained), again voted to approve Diamond's entry

into a merger agreement with Apollo.

58.     Through these and other forms of participation and control, the Individual

Defendants had substantial influence over Diamond, the information it distributed, and the actions

it engaged in.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Overview of Diamond's Business[12]

22.     Diamond was an international hospitality business that sold timeshares.

Specifically, Diamond sold VOIs and members received an annual allotment of credits ("Points")

based on the number of VOIs they owned.  These Points could be spent to book vacations within

Diamond's network of properties.  This network included 379 vacation destinations in 35

countries throughout the world.

23.     Diamond was founded by Defendant Cloobeck who remained its CEO until the

time Diamond conducted its IPO on July 24, 2013.  From that date and until the sale Transaction

to Apollo on September 2, 2016, Diamond was a publicly traded company listed on the NYSE.  Its

corporate headquarters was located in Las Vegas, Nevada.[13]  As of December 31, 2015, it had

69,705,619 shares outstanding and according to the Recommendation Statement it had 69,745,698

shares outstanding as of July 13, 2016 and as of the Transaction.

59.     Following its IPO in 2013, Diamond was highly successful at growing its business.

The following table shows its total revenue and total profit as reported in its 2015 Annual Report,

published with the SEC on February 29, 2016:

[table on following page]

---

[12] The overview of Diamond's business is described in the past tense as it references facts that existed
before and during the Class Period.

[13] References throughout to certain things being true in the past tense are not meant to imply they do not
remain true in the present.  For example, Diamond still is headquartered in Las Vegas, Nevada.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

| FY Ending | 2013 | 2014 | 2015 |
|---|---|---|---|
| Total Revenue | $730 million | $845 million | $954 million |
| Net Income | ($3 million) | $59 million | $149 million |

60.     Throughout the Class Period, Diamond reported two business segments (described in more detail below), which reflected the two major aspects of its business and its two major sources of revenue.  The revenue from each segment is shown in the following table:

| FY Ending | 2013 | 2014 | 2015 |
|---|---|---|---|
| Hospitality Segment | $176 million | $199 million | $188 million |
| Sales Segment | $553 million | $644 million | $765 million |

### 1.     Vacation Interest Sales and Financing

61.     Through the Vacation Interest Sales and Financing Segment ("Sales Segment") Diamond made money by selling VOIs to potential consumers.  It did this primarily through "tours" orchestrated by 61 sales centers, which were mainly located at its resorts.  The business involved marketing these tours, including through discounted mini-vacation packages and by targeting existing Diamond customers.

62.     The number of VOIs that Diamond could sell was limited because, as a practical matter, these VOIs corresponded to actual resort usage.  Thus overselling VOIs would amount to overbooking its resorts.  In order to maintain sales of VOIs, Diamond would either acquire new resort space (or other products such as cruises and experiences) or reacquire VOIs from existing customers—which it could then resell.  Diamond acquired new resort space through strategic acquisitions of existing resorts.  Diamond was able to reacquire a significant number of VOIs every year by repurchasing them from consumers who would rather walk away from their VOI than continue paying regular maintenance fees and also by collecting VOIs when consumers defaulted on loan obligations.

63.     Diamond also provided financing to many of the consumers who purchased VOIs from it.  This financing generally had a fixed interest rate, a 10 year term, and required the purchaser to make a down payment within established credit guidelines.  As of its 2015 Annual

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Report, these loans had an average interest rate of 14.9%, which included an average interest rate for loans in default of 16.4%. However, only 8.8% of VOI owning families had an active loan with Diamond. Throughout its history, Diamond securitized a large portion of the loans it originated. This meant that it bundled up the loans, parked them into a special purpose entity and sold debt-based securities in that entity to investors—a process that effectively allowed Diamond to market these loans to investors on attractive terms.

### 2. Hospitality and Management Services

64. As of its 2015 Annual Report, Diamond managed 109 resort properties as well as an additional collection of resorts referred to as the "Diamond Collections." Diamond typically received management fees under contracts with the resorts that were owned by its network of customers. While technically the VOI holders could hire other management, substantially all of the management contracts renewed automatically. The management fees were designed to cover the actual costs of management and to ensure Diamond received a profit for its efforts as manager.

65. As the manager, Diamond operated the front desks, and provided housekeeping, maintenance, and human resource services to the resorts. It also operated or outsourced the operation of various additional resort amenities, such as golf courses and restaurants.

### B. The Value of Diamond Stock Falls as Investors Short the Company

66. Due to its impressive financial results, Diamond stock increased from an IPO price of $14 per share in July 2013, to a peak of $32.18 in the first quarter of 2015. However—despite continuing to deliver impressive financial results—the price of Diamond stock began to decline under the pressure of short sellers.

67. By the end of 2014, Diamond had become a major target for short sellers. Short selling refers to the practice of borrowing shares one does not own and then selling those shares. At a later date, the short seller will need to purchase shares from the open market, or third party, to return the borrowed shares. If the share price increases, the short-seller loses money when he or

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    she is forced to repurchase the shares at a higher price and sell them back to their original

2    counterparty at a lower price.  If the shares fall in price, the short seller makes money by

3    repurchasing the shares at a lower price, thereby profiting an amount equal to the price drop (less

4    certain transaction costs) when those shares are ultimately returned to the party who loaned the

5    short-seller the shares.  In substance, a short sale is a bet that the company's stock will fall in

6    value.[14]

7         68.    It is widely accepted by financial professionals that a large short position can

8    reduce the price of a stock.  Shorting can be interpreted as a negative signal about the Company,

9    which may persuade other investors that the Company is overvalued.  It also reduces the stock

10   price by increasing the number of shares that are sold at a given price, since each share shorted is

11   also a share sold, which likely wouldn't have been sold at that price otherwise.

12

13        69.    Near the end of 2014, short reports—which are essentially persuasive reports

14   published to attack a company in hopes of pushing the stock price lower—began to be published

15   about Diamond.  For example, in November 2014, a report was presented to an investor

16   conference in Boston and won the conference's contest for short-reports.  At the time of that

17   report, Diamond stock was trading at nearly $25.61.  The presentation criticized various aspects of

18   Diamond's business and argued that the Company's sales pitches were unduly aggressive.  This

19   presentation was discussed in a lengthy Wall Street Journal article, where Defendant Palmer was

20   quoted as saying: "every page [of the presentation] has some form of mistake."  The Company

21   also issued a statement alleging "gross misstatements" in the report.  This report also drew a

22   public line-by-line refutation from Post Road Capital Management, an investment manager that

23   had invested in Diamond.

24

25        70.    By mid-September 2015, the short interest in Diamond had increased to over 24

26   percent.  This meant that for every ten shares outstanding there were two open "short" contracts,

27

28   _____

[14] As a practical matter, short sellers may utilize other mechanisms to avoid actually buying and selling

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

requiring a short seller to eventually buy back the shares at some later date. This is far higher than the market average, which was approximately 5 percent. This large short position was particularly surprising, given that by 3Q2015, Diamond had grown every quarter for over two years. By the end of September 2015, Diamond stock was trading at $23.39 per share.

71.     Another lengthy short report was published on January 20, 2016, on the investment website Seeking Alpha attacking Diamond's business model and arguing that fundamentally, the business was not sound because it depended on selling an overpriced product. The article's thesis was that Diamond was at risk of a downturn or regulatory investigation because its sales practices were unseemly and its customers were engaging in economically irrational activity by purchasing. This article prompted a robust debate on the Seeking Alpha website, with many arguing that the author did not understand Diamond's business model and defending the opportunity it offered customers.

72.     Then, on January 22, 2016, the New York Times published a scathing critique of Diamond titled "The Timeshare Hard Sell Comes Roaring Back" detailing consumer complaints against the Company regarding its aggressive sales practices. This article also questioned the economic value of Diamond's VOIs, given that they are typically sold by Diamond for thousands of dollars, but on Ebay there were over 700 VOIs available for $1 each—which reflected the fact that owning a VOI carries contractual maintenance obligations, and which therefore suggested that many customers would voluntarily hand over their investment to avoid incurring future maintenance fees. The New York Times article also stated that "some in the industry have cautioned in recent months that regulators from the Consumer Financial Protection Bureau could increase their oversight."

73.     The negative thesis against Diamond was generally focused on the consumer and argued that the business was not sustainable. The story was essentially that the business would

shares—but the description above describes the economic logic and result of short selling.

1  eventually collapse because it was built on high-pressure sales tactics and that consumers were

2  ultimately unhappy with Diamond's product. Either the market would smarten up and stop doing

3  business with Diamond or regulators would intervene in ways that undermined the Company's

4  profitability.

5         74.     In response to these criticisms, Defendant Palmer explained to the New York

6  Times that roughly 60 percent of the Company's sales came from existing customers. This fact,

7  according to Palmer, demonstrated that those purchasing from Diamond wanted to purchase more,

8  and that they were happy, repeat customers. This persuasive data point was coupled with specific

9  commentary by Diamond, defending its sales policies, and a statement that buyers have five to ten

10  days to think about their decision once they purchased a VOI.

11

12         75.     At this point, Diamond was a "battle ground stock." The short interest continued to

13  amass, representing the many investors who felt that the Company was unsustainable and

14  overvalued. On the other hand, many investors saw a highly profitable and growing resort

15  company with many happy repeat customers to verify the legitimacy of the product Diamond sold

16  and the Company's financial success.

17

18         C.     **Apollo Approaches Diamond Regarding a Strategic Transaction and Diamond Announces that it is Exploring a Sale**

19         76.     In the spring of 2015, the Board formed a committee to explore possible strategic

20  transactions to maximize shareholder value, including a possible sale of the Company. However,

21  after hiring the investment bank Centerview, and considering its options, Diamond decided against

22  a transaction and disbanded the committee in September 2015. The formation and disbandment of

23  this first committee was not disclosed to the public at the time.

24

25         77.     It was not disclosed until after the Class Period, but just a few months later, on

26  January 16, 2016, Sambur, a senior partner at Apollo, approached Diamond's management team

27  regarding a potential transaction. As recorded in a June 20, 2016, internal Apollo memo, Apollo

28  "approached [Diamond's] management team in early January regarding a take private

- 27 -

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    transaction." Notably, this order of events contradicted the narrative that would later be provided

2    by Diamond in its Recommendation Statement, which misleadingly indicated that Apollo

3    approached Diamond only *after* Diamond's public announcement in mid-February 2016 that it had

4    initiated the strategic review process. That Apollo had already been in negotiations with Diamond

5    for at least a month at the time of this announcement was material information for investors: it

6    would have indicated that competing bids were at a disadvantage by having less time to explore

7    the Transaction, that Diamond may have favored Apollo, and it may have understated Apollo's

8    interest in Diamond. Furthermore, the timing of Apollo's interest would also have materially

9    affected how investors would have interpreted the incentives of Defendant Cloobeck, Defendant

10    Palmer, and Mr. Kraff. All three Defendants had Call Options set to expire in July 2016, and

11    needed to have the deal consummated, or at least announced, by the July date. Apollo had a

12    definite head start on its competition in vetting and analyzing the deal.

13

14        78.     It was also not disclosed until after the Class Period, but on the very same day that

15    Apollo approached Diamond in mid-January 2016, Centerview presented a slide deck to Diamond

16    regarding Diamond's valuation—which included a DCF analysis of Diamond's intrinsic value that

17    showed a value of $39.85 to $53.50 a share.

18

19        79.     On February 24, 2016, Diamond filed a Form 8-K announcing its fourth quarter

20    2015 results. That report showed that the Company had achieved ten straight quarters of record

21    financial performance and provided guidance that projected 2016 to be another record year.

22    However, in the same Form 8-K, Diamond attached a press release quoting Defendant Palmer for

23    the proposition that there was a "significant dislocation between the intrinsic value" of the

24    business and the share price for its common stock. Defendant Palmer explained that due to this

25    "dislocation," the Board was initiating a "process to explore and evaluate a wide range of strategic

26    alternatives to unlock value for shareholders." The report also noted that there was "no assurance"

27    that any strategic transaction would result from this exploratory process and indicated that the

28

Company did not intend to discuss the matter further until the Board had approved a specific action or otherwise determined that further disclosure is appropriate.

80.    In the conference call associated with this announcement, Defendant Palmer elaborated on this situation.  He explained that there have been "ongoing market rumors, speculation, and mistruths that distracted the market from the work our team has done to produce these record results."  This was a clear reference to the criticism by short sellers and the rumors that severe regulatory action was going to be taken against the Company to curb its aggressive sales practices.  He added that "[t]his misinformation bears no relation to our Company's values, practices, and prospects, and we will not allow them to distract us from building our business."  He further explained that this situation has resulted in a disconnect between the Company's intrinsic value and share price, and that therefore the directors were exploring a wide range of strategic alternatives.  He also disclosed that the "process will be led by a committee of independent directors, which has retained Centerview Partners as its financial advisor."

81.    The Strategic Review Committee was composed of Defendants Berkman, Jones, Wolf and Taitz, with Defendants Taitz and Wolf serving as co-chairs.

82.    The market responded positively to the announcement that Diamond was exploring a strategic transaction.  For example, an analyst report by SunTrust Robinson said that the announcement should not be a "surprise" given the private equity background of the management team but noted that investors could expect a "nice 'pop' tomorrow."  In fact, the stock price did increase from a close of $19.55 on February 24, 2016, to a close of $24.40 on February 25, 2016—a 21.45% increase.  Notably, this remained well below the price targets that some analysts continued to target for Diamond stock (*e.g.*, J.P. Morgan at $40 a share and SunTrust Robinson at $39 a share).

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

**D.      Incentives and Conflicts Motivate and Taint the Strategic Review Process**

83.      As described in this section a variety of personal incentives and conflicts detracted from the strategic review process, which ultimately resulted in a transaction that deprived shareholders of the true value their shares.

**1.      Defendants Cloobeck and Palmer and Mr. Kraff Needed to Announce a Transaction by July 2016 in Order to Cash In Their Call Options**

84.      The press releases and related public statements about the strategic review omitted any discussion of another key motivation for the potential strategic transaction; Defendants Cloobeck and Palmer and Mr. Kraff (collectively, the "Option Holders") each beneficially owned a large block of Call Options that were set to expire on July 21, 2016.

85.      These Call Options, which are described in more detail below, were disclosed in public filings. However, it was not disclosed that Defendant Palmer and Vice-Chairman Kraff had actually colluded to time the sale process to maximize the value of these Call Options. As revealed (after the Class Period) in the Delaware Litigation, Diamond's then-Vice Chairman of the Board Mr. Kraff texted Defendant and then-CEO Palmer in late January 2016 saying "[w]e have to get this private before July," to which Defendant Palmer responded, "[o]r at least announce a deal." The clear meaning of this conversation was that Defendant Palmer and Kraff were motivated to time the announcement of a deal—so that the stock price would positively affect the value of their expiring Call Options.

86.      These Call Options were held through an entity called 1818 Partners, LLC ("1818 Partners"). The Option Holders each had an equal interest in 1818 Partners and in any distributions that were made from 1818 Partners. 1818 Partners held two types of options. First, it held the DRPH Call Option, which represented the right to purchase 4,535,426 shares at a strike price of $12.56. Second, it held 431,875 "Third Party Call Options" with a strike price at $12.56.

87.      While these Options were potentially worth tens of millions of dollars, they also posed a complex issue for the Option Holders. To exercise options one needs to invest in the

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Company by purchasing shares at the strike price. Thus, to exercise all the Call Options, the Option Holders would need to invest about $60 million into Diamond.[15] It is not unusual for people executing options to borrow money from a financial institution, exercise the options, sell the shares, and then repay the money they borrowed (the "buy-then-sell" maneuver). However, such a major sale of Diamond Shares by insiders would have been perceived by investors as a seriously negative sign about the Company's future prospects and could be expected to severely impact the price of Diamond stock. Therefore, this buy-then-sell maneuver would likely be economically problematic for the Option Holders, especially given that they held large quantities of Diamond stock, outside of these Call Options. The alternative to the buy-then-sell maneuver would require each Option Holder to find millions of dollars to invest in Diamond, which, besides being a potentially challenging depletion of personal liquidity,[16] could further expose them to any risks regarding Diamond's business.

88.     A solution to these problems regarding the execution of the Call Options would be to announce a sale of Diamond. In a sale situation, investors would not view the sale of shares by insiders as a negative signal at all. However, to make this work, the Option Holders would need to announce the sale prior to the expiration of these options on July 21, 2016.

89.     The exact financial incentives provided by the Call Options were complex. However, as an analyst for SunTrust Robinson wrote on June 3, 2016, the Call Options could be a "catalyst" for a deal. As of the Company's 2016 Proxy, filed April 15, 2016, the stock holdings of each of the Option Holders was as follows:

[table on following page]

---

[15] The DRPH Call Options included a "cashless exercise" mechanism, through which management could access the value of these options without a cash outlay, but such option would have been largely the same as the buy-then-sell maneuver described below.

[16] It might also have been possible to borrow this money, which would only heighten to risks this investment would pose and heighten the transaction costs (through interest on the borrowed money) associated with executing these Call Options.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

| | Number of Call Options | Value of Options on June 27, 2016, Before Deal Announcement[17] | Value at deal price of $30.25[18] | Profit on Timing Deal (per option) | Profit on Timing Deal (total) |
|---|---|---|---|---|---|
| Defendant Cloobeck | 1.66 million | $17.38 | $29.29 | $11.91 | $19.77 million |
| Defendant Palmer | 1.66 million | $17.38 | $29.29 | $11.91 | $19.77 million |
| Mr. Kraff | 1.66 million | $17.38 | $29.29 | $11.91 | $19.77 million |

### 2.  Members of the Strategic Review Committee Were Conflicted Due to Relationships With Apollo

90.     In additional to numerous Diamond directors having a financial incentive to push a deal through, still other directors were conflicted with regards to their roles in the deal process – which favored Apollo to the detriment of shareholders.  Defendant Taitz' position as co-chair of the Strategic Review Committee posed a serious conflict that threatened the integrity of the deal process.  Defendant Taitz has close personal ties with the co-founders of Apollo, beginning in the mid-1980's when the three attended Wharton Business School together.  Apollo co-founder Josh Harris and Defendant Taitz both graduated in 1986 and another of Apollo's three co-founders, Marc J. Rowan, graduated in 1984.  In 1985, Mr. Rowan started working on the M&A desk at Drexel Burnham Lambert, Inc. and Defendant Taitz and Mr. Harris joined the following year.  All three remained at the firm until it collapsed in 1990.  Defendant Taitz and Mr. Rowan support each other's philanthropic efforts, including the Youth Renewal Fund and the "Pencils of Promise" charity gala.  Most importantly, as disclosed on Diamond's 2016 Proxy Statement, Defendant Taitz served on the boards of *twelve* companies affiliated with or owned by Apollo, which was very lucrative to Defendant Taitz personally.

---

[17] This column shows the estimated amount of money each Option Holder would have received, had they executed their options on June 27, 2016, a few days before the deal was announcement at that day's closing price of $23.42 per share, ignoring any transaction costs related to selling and ignoring any negative impact on stock price caused by insider selling.

[18] This column shows the estimated money each Option Holder received at the eventual $30.25 price they tendered their shares at.  As used in this table, the term "value" refers only to this calculation and not to the intrinsic value of Diamond stock.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

91.     Additionally, Defendant Taitz has admitted to the conflict, through counsel, in Delaware Litigation.  In an oral argument Defendant Taitz's counsel said:

> With respect to Ms. Taitz, her connection with Apollo is well established. . . . Her connection with Apollo is undisputed.  It's not a situation where plaintiffs have a burden of trying to establish a tenuous conflict. The connection between Ms. Taitz and Apollo is there.  Everybody knows what it is. . . . The connection is established.

92.     Defendant Jones, another member of the Strategic Review Committee, was also seriously conflicted due to his service as CFO of two companies that were owned by Apollo from 1999 to 2012.  Roughly a year after the Transaction was completed Apollo acquired ClubCorp and appointed Defendant Jones to its board of directors.

93.     In March 2016, the Strategic Review Committee hired the law firm Gibson, Dunn & Crutcher LLP ("Gibson Dunn") to provide legal advice and again retained Centerview to provide investment banking services.  Once again, Diamond's Board, the Strategic Review Committee, and Centerview should have immediately recognized a significant conflict generated by Centerview's prior work on Apollo's deals.  Centerview had a history of working with Apollo affiliated Companies including Caesars Entertainment Corporation and Hexion, Inc.  This conflict was ultimately disclosed by Diamond in the Recommendation Statement, though certain details were omitted, such as the amount of compensation that Centerview received through these arrangements.  While there is nothing inherently problematic about Centerview having a prior relationship with Apollo, there is a real chance that Centerview's past relationship with Apollo affected its motivations.  Notably, the previous work for Caesars Entertainment was huge in comparison to Diamond—Centerview's website values the deal at 17.2 billion—more than 8 times the price Apollo paid for Diamond, suggesting that Centerview may have had more lucrative opportunities available to it by pleasing Apollo.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

E.   **The Strategic Review Committee Conducts a Hasty Sale process**

1.   **Centerview Solicits Interest in the Transaction**

94.   After Diamond announced the formation of the Strategic Review Committee, Centerview approached potential acquirers and shared certain diligence information with these parties.  During the week of April 25, 2016, Centerview received indications of interest from five parties at prices ranging from $23 per share to $33 per share.  Apollo expressed interest in the range of $28-$30 per share.  Reverence Capital expressed interest at a price of $28-$33.

95.   On May 2, 2016, the Board met to discuss the prospect of selling the Company. The Board purportedly determined that a sale might represent the best option for shareholders and authorized Centerview to continue the sale process with the potential bidders.

96.   Following the announcement of the formation of the Strategic Review Committee, Diamond remained quiet about the process.  However, it did mention as part of its May 4, 2016, press release regarding its first quarter 2016 financial results, that the "Board continues to pursue the strategic alternatives process."  The results posted at that time showed yet another quarter of record financial performance.

97.   On May 14, 2016, in the middle of this sale process, Defendant Cloobeck wrote to Defendant Taitz stating that he had "bought and sold many companies" and that he "wouldn't do this."  Nevertheless, the Strategic Review Committee, led by the conflicted Defendant Taitz continued the sale process.  Defendant Cloobeck's oppositional email to Defendant Taitz was first disclosed in the Delaware Litigation, after the Class Period.

2.   **Interested Parties Were Rushed to Make Final Bids**

98.   The sale process continued throughout May 2016, with additional diligence by those involved.  On May 27, 2016, Centerview sent letters to the potential bidders requesting that they submit any markups to a proposed merger agreement by June 17, 2016, and submit bids by June 23, 2016.  During May and June, Apollo and Reverence Capital met with Centerview and Defendant Palmer, and inquired as to whether Defendant Palmer would be interested in staying on

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    as CEO after the transaction.  Defendant Palmer indicated he would be willing to do so, but no

2    formal agreement or commitment was made.

3        99.    On June 16, 2016, the Strategic Review Committee met again to discuss the sale

4    process and the financial condition of the potential acquirers.  The next day, counsel for Apollo

5    submitted a markup of the draft merger agreement.  Gibson Dunn provided a further revised draft

6    to Apollo on June 20, 2016.  On June 21, 2016, counsel for Reverence Capital submitted a markup

7    of the draft merger agreement.  Gibson Dunn purportedly corresponded with Reverence Capital's

8    legal counsel regarding its markup, and Reverence Capital did not resubmit a revised markup.  On

9    June 22, 2016, Apollo provided a further revised draft.

10       100.    On June 23, 2016, Apollo submitted a bid of $30.25 along with further revised deal

11   documents.  Reverence Capital submitted a bid with a range of $27-$29, together with executed

12   commitment papers.  However, it also requested an additional 30-45 days to complete diligence.

13   In other words, Reverence Capital made it perfectly clear to the Company that it needed more

14   time—that the process was being rushed.  This also meant that it was entirely possible Reverence

15   Capital would be willing to bid higher if that additional time was provided.  Indeed, Reverence

16   Capital's initial bid was $28-$33 per share.  It is astounding that this time was not afforded to

17   Reverence Capital, especially given that Apollo had at least a 39 day head start on its review

18   process—due to the undisclosed fact that Apollo had approached Diamond before the Company

19   announced the Strategic Review Committee.  However, the need to rush the deal through matched

20   the needs of the Option Holders—and in fact, Defendant Palmer, Defendant Cloobeck, and Mr.

21   Kraff's options would have expired before the 30-45 day period elapsed.  It also served the needs

22   of Apollo and, therefore, Defendants Taitz and Jones – two members of the four person Strategic

23   Review Committee – who owed their allegiance to Apollo.

**3.** **Apollo's Offer is Accepted by Diamond's Board, Except Defendant Cloobeck who Opposed the Transaction**

101.    The same evening that Apollo submitted its bid, on June 23, 2016, the Strategic Review Committee met to discuss the bids.  At this time, over 5 months after Apollo first engaged Diamond, Defendant Taitz finally decided to recuse herself from further Strategic Review Committee meetings.  According to the Recommendation Statement, she did this "in light of her position as a director on boards of entities affiliated with Apollo."  However, Defendant Taitz did not recuse herself from the process entirely and remained involved as a Board member generally—her recusal was only with respect to the Strategic Review Committee.  At that meeting the committee discussed the bids and determined to reconvene the following day and to request a meeting of the full Board to discuss the sale process.

102.    On June 24, 2016, the U.K. voted to leave the E.U. (i.e., the "Brexit" vote) and the capital markets experienced significant volatility.  Despite the fact that this event may have disrupted the effectiveness of the sale process, the Board did not pause the process and instead met that very day to review the bids that had been received.  The Board authorized Centerview to seek best and final bids.  Later that day, Centerview contacted Apollo, and Apollo declined to increase its bid.  Centerview also contacted Reverence Capital, who indicated that it could be in a position to provide best and final bids after it completed additional diligence.  Rather than providing this additional time, the Board rushed into a vote.

103.    The next day, on June 25, 2016, the Board, Centerview, Gibson Dunn, and Diamond's Senior Management met and discussed the status of the bidding process.  The Board held a vote to authorize Centerview and Gibson Dunn to negotiate a final merger agreement with Apollo at the $30.25 price—and all directors voted in favor except for Defendant Cloobeck who abstained from voting.  As first disclosed later on in the Delaware Litigation, Defendant Cloobeck vocally opposed the Transaction, and the Board minutes recorded this opposition as follows:

> [Defendant Cloobeck] was disappointed with the price and the
> Company's management for not having run the business in a manner
> that would command a higher price, and that in his view, it was not
> the right time to sell the Company.

104.    Gibson Dunn continued negotiating the terms of the Transaction documents with Apollo's legal counsel, and on June 26, 2016, during a Strategic Review Committee meeting, Gibson Dunn reported that the documents were in substantially final form.  During this meeting, Centerview provided an oral opinion[19] that the transaction was fair from a financial point of view (the "Fairness Opinion").  A fairness opinion does not indicate that a proposed transaction is advisable or in the shareholders' best interest and, in fact, the Centerview's opinion "expressed no view as to . . . the Company's underlying business decision to proceed with . . . the transaction." Rather a fairness opinion uses the term "fair" as a "ter[m] of art with tightly circumscribed meanin[g]," which only states that "the price lies within a range of intrinsic values, any of which could be fair."[20]  The purpose of such opinions is to establish that the company's board took steps to become informed.  Fairness opinions do not provide proof that the price was fair and, in fact, the $30.25 deal price offered by Apollo was not fair as it grossly undervalued the Diamond stock.

105.    Also on June 26, 2016, Diamond's Board, Gibson Dunn, and Centerview held a meeting.  Centerview reiterated its Fairness Opinion.  The Board held a vote to approve the merger agreement and the Transaction—and all directors voted in favor except for Defendant Cloobeck who abstained from voting.  As first disclosed in the Delaware Litigation, Defendant Cloobeck vocally opposed the Transaction, and the Board minutes recorded this opposition as follows:

> [Defendant Cloobeck] was disappointed with the price and the
> Company's management for not having run the business in a manner
> that would command a higher price, and that in his view, it was not
> the right time to sell the Company.

---

[19] Centerview later provided a written fairness opinion as well.
[20] William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 Tex. L. Rev. 1, 16 (2014).

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

106.    Over the next two days, additional revisions were made to the Transaction documents.  On June 28, 2016, the Board met again and held yet another vote where once again each director voted in favor of the Transaction, except Defendant Cloobeck who again abstained from the vote.

**F.    Diamond Announced Proposed Transaction with Apollo**

107.    On June 29, 2016, Diamond and Apollo issued a joint press release announcing the deal.  That press release stated: "Apollo Funds will acquire Diamond Resorts for $30.25 per share or approximately $2.2 billion" and stated that this represented a premium of approximately 26% compared to the closing price of $24.07 per share of Diamond stock, on June 28, 2016.  The release explained that Diamond's Board approved the transaction upon recommendation from the Strategic Review Committee.  It also quoted Defendant Palmer as stating that "[t]his transaction is an excellent outcome for our shareholders" and invoked Defendant Cloobeck's name in the deal, saying that Apollo "values the culture of hospitality and customer service that is the legacy of our Founder and Chairman Stephen J. Cloobeck and instilled in our organization."

108.    The announcement stated that the Transaction would be completed through an all-cash tender offer.  It also stated that the transaction was conditioned upon satisfaction of a minimum tender condition which would require that shares representing more than 50% of the Company's common shares be tendered, as well as the receipt of certain regulatory approvals and other customary closing conditions.  It added that "[t]he transaction is currently expected to close over the next few months."

109.    Diamond also filed the merger agreement and a Form 8-K stating certain terms of the Transaction.  Certain of those key terms are summarized below, and the entirety of the merger agreement is incorporated by reference into this complaint:

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

(a)     Form of Merger.  Following the consummation of the Tender Offer, a merger was to be completed pursuant to Section 251(h) of the Delaware General Corporation Law, without a meeting of the shareholders, as soon as possible following the Tender Offer.

(b)     Timing and Extensions.  The Tender Offer was set to remain open for 20 business days.  If the merger conditions were not satisfied, the offer would be extended for one or more consecutive periods of up to five business days "to permit the satisfaction of all Offer conditions."

(c)     Payment to Non-Tender Shareholders.  At the "effective time" of the merger, each share that was not tendered (other than certain excluded shares, such as those owned by Apollo or the Company) would be "automatically cancelled and converted into the right to receive [$30.25]," unless the shareholder had perfected and not withdrawn a demand for appraisal under Delaware law.

(d)     Termination Rights.  Either Apollo or Diamond could terminate the merger agreement under certain conditions.  If the merger was terminated by Diamond, it was required to pay $44.6 million to Apollo.  If Apollo terminated the merger, it was required to pay Diamond $133.8 million.

110.    Apollo filed a Schedule TO with the SEC indicating that it planned to commence a tender offer, but had not yet initiated the offer itself.  Also on June 29, 2016, Diamond issued an additional Form 14D-9, comprised of a letter by Defendant Palmer.  It stated that "we are pleased to announce that we have entered into a merger agreement under which an affiliate of Apollo Global Management, LLC . . . will acquire Diamond Resorts."  Furthermore, it incorporated the press release described in Paragraph 107.

**G.    Apollo Makes the Tender Offer and Diamond Issues the Recommendation Statement**

111.    After market close on July 14, 2016, Apollo formally initiated its Tender Offer. The price was as previously stated: $30.25.  The offer was set to begin immediately and was set to

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

expire on midnight August 10, 2016, unless extended before then. The Tender Offer also provided certain withdrawal rights, allowing tendering shareholders to withdraw their shares prior to the expiration of the offer or, if they have not yet received payment, prior to September 12, 2016.

112.    Also on July 14, 2016, after the market closed, Diamond filed its Recommendation Statement with the SEC. The Recommendation Statement was a large document issued by the Company, in support of the Tender Offer. As detailed below, the Recommendation Statement made various statements on behalf of the Individual Defendants as Diamond's senior management and members of the Board, in such a way that indicates the Individual Defendants were involved in its preparation. The Recommendation Statement was signed by Jared T. Finkelstein on behalf of Diamond as its General Counsel and Secretary.

113.    As relevant here, there were several key aspects to the Recommendation Statement including: (1) a description of the Board's votes regarding the Transaction; (2) recommendations that shareholders approve the Transaction; (3) a description of Centerview's Fairness Opinion; (4) a description of the decision making-process utilized by the directors in deciding to recommend that shareholder accept the Tender Offer; (5) a description of employment agreements and other possible sources of conflict for the directors; (6) a description of plans to tender shares; and (7) a description of appraisal rights. As discussed below, several of these descriptions omitted material information and were false and misleading.

### 1.    Description of the Board's Voting

114.    The Recommendation Statement's description of the Board's votes regarding the merger was false and misleading.

115.    According to the Recommendation Statement:

> On June 25, 2016, each of the strategic review committee and the full board of directors held meetings to receive updates from Centerview and Gibson Dunn. The Company's senior management was also present for the board of directors meeting. During the

> board of directors meeting, upon the recommendation of the
> strategic review committee, the board of directors authorized
> Centerview and Gibson Dunn to negotiate a final merger agreement
> with Apollo at the $30.25 price per Share of Company Common
> Stock. The Company's chairman abstained from this vote.

116.     While it is literally true that the Defendant Cloobeck abstained from the vote, the

previous paragraph misleadingly omits the fact that Defendant Cloobeck vocally opposed the

Transaction.  Of course, aside from opposing the deal because it was bad for shareholders, one

might abstain from a vote for any number of reasons including: conflicts of interest; incapacity;

laziness; moral opposition to the deal terms as bad for non-shareholder stakeholders (like

employees, customers and vendors); concern that a counter-party was being defrauded; opposition

to the voting process itself; maneuvering for leverage for personal benefit; mistake; strategy

regarding personal publicity; or contractual obligations.  The Registration Statement, however,

failed to indicate whether Defendant Cloobeck's reason for abstaining was benign or whether

Defendant Cloobeck was vehemently opposed to the deal (as he was here).

117.     The Recommendation Statement similarly and misleadingly describes the Board's

vote on June 26, 2016.  It says:

> The board of directors approved the entry into the merger agreement
> and the consummation of the transactions contemplated thereby. The
> Company's chairman abstained from this vote.

118.     However, the truth was that Defendant Cloobeck vocally opposed the Transaction,

he did not merely abstain.

## 2.     Recommendation that Shareholders Approve the Transaction

119.     The Recommendation Statement stated that "[f]or the reasons described . . . the

board of directors of Diamond Resorts . . . acting upon the recommendation of the strategic review

committee of the board of directors . . . recommends that Diamond Resorts' stockholders accept

the tender offer and tender their Shares pursuant to the tender offer."

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

### 3. Centerview's Fairness Opinion

120.    The Recommendation Statement contained a detailed summary of Centerview's financial analysis and attached the full-text of the written opinion letter as an exhibit. The Recommendation Statement also provided a summary of Centerview's financial analysis. This analysis included, among other things, a comparison of Diamond's financial information with the financial information of certain comparable companies, a comparison of similar "precedent transactions," and a DCF analysis. The DCF analysis that utilized the forecasts provided by management suggested the Diamond shares were worth between $30.25 and $45.20.[21] This meant that the deal price Apollo would pay was at the absolute bottom of the DCF valuation range.

121.    Notably, this DCF range was far below the prior undisclosed range presented by Centerview. It was not disclosed during the Class Period, but back on January 16, 2016, the same day that Apollo first approached Diamond about a potential deal, Centerview presented a slide deck showing the intrinsic value of the Company to be in the range of $39.85 to $53.50 a share. By this measure the deal price was far below the range of valuations that Centerview would have considered fair just 6 months earlier. There was no credible basis for the DCF analysis—which is a fundamental evaluation wholly distinct from the Company's share price—to change by this much in less than half a year. This is especially true given that Diamond's results for the first quarter of 2016 were tremendously successful—as stated by Defendant Palmer in the associated press release: "This quarter marks our eleventh consecutive record quarter. . . I am very pleased with our performance and confident in our full year guidance." Furthermore, Centerview itself wrote in a May 2, 2016, presentation that "[i]n the past 12 months, Diamond's share price decline appears to have been driven by negative market sentiment rather than any deterioration [in performance]."

---

[21] Centerview also performed a DCF analysis using outsider estimates (rather than management forecasts)—this produced a range from $28.05 to $42.45.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
801 SOUTH RANCHO DRIVE
QUAIL PARK, SUITE D-4
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

### 4.   Directors' Decision Making Process

122.   The Recommendation Statement contained a lengthy section titled "Reasons for Recommendation," that purportedly described the material factors that the directors on the Strategic Review Committee and Board of Directors considered when they purportedly determined that tendering shares and approving the Transaction was "advisable," "fair to" and "in the best interest of" the Company's shareholders.   Specifically, it stated that "the board of directors collectively reached the conclusion to approve the transaction."

123.   Diamond stated that one of the material factors considered when evaluating the possible Transaction was:

> [T]he review of possible strategic and financial alternatives to a sale of the Company conducted by the strategic review committee and the board of directors prior to the entry into the merger agreement, including the possibility of continuing as an independent public company, capital structure optimization or pursuing other business combinations, which the strategic review committee and the board of directors evaluated with the assistance of Centerview and determined were less favorable to the Company's stockholders than the transaction in light of the potential risks, rewards and uncertainties associated with those alternatives[.]

124.   It also stated that one of the material factors considered when evaluating the possible Transaction was:

> [T]he fact that the resolutions approving the merger agreement and the transaction were recommended by the strategic review committee, which is comprised of four independent directors, and approved by the board of directors, which is comprised of eight out of nine directors who are not officers of the Company or any of its subsidiaries, and the strategic review committee and the board of directors retained and received advice from Centerview, an experienced financial advisor, and outside legal counsel, Gibson Dunn, in evaluating, negotiating and recommending the terms of the merger agreement[.]

125.   Additionally, it stated that:

> The foregoing discussion of the factors considered by the strategic review committee and the board of directors is not intended to be exhaustive, but rather includes the principal material positive factors and material negative factors considered by the strategic review committee and the board of directors.

- 43 -

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

126.    This section also included 14 bullet points detailing countervailing factors that the directors considered when choosing to recommend the Transaction.  For example, Diamond's Board purportedly considered: the potential upside of the Company's strategic plan; the fact that the Company will no longer be publicly traded; restrictions on the merger; the merger terms including the termination fees; risks the Transaction will not be consummated; risks regarding the counterparty; regulatory clearance; disruption caused by the Transaction; transaction costs;  taxes; and "the fact that certain executive officers and directors of the Company may have interests in the transaction that are different from, or in addition to, those of the Company's stockholders."

127.    The Recommendation Statement stated that this list was not exhaustive but also stated that it included the "**principal material positive factors**" as well as the "**material negative factors**" the Board considered.

128.    In fact, the Recommendation Statement omitted all mention of the fact that the Company's founder, Defendant Cloobeck voiced specific concerns about the Transaction price, the management of the Company, and the fact that it was not the right time to sell the Company.

129.    The rationale for Defendant Cloobeck's abstention, and the fact that he communicated this rationale to each of the directors during multiple meetings of the Board, was of immense significance.  Indeed, the Company had previously touted the significance of Defendant Cloobeck's insights into the Company's present and future outlook.  For example, the Company's 2016 Proxy Solicitation document stated that:

> The Board believes that Mr. Cloobeck, as our founder and the former Chief Executive Officer of Diamond LLC, should continue to serve as a director because of Mr. Cloobeck's unique understanding of the opportunities and challenges that we face and his in-depth knowledge about our business, including our customers, operations, key business drivers and long-term growth strategies, derived from his 30 years of experience in the vacation ownership industry and his service as our founder and former Chief Executive Officer.

### 5.   Employment and Consulting Agreements

130.   In addition to purporting to disclose any value that the directors would receive from their shareholdings and options through the Transaction, the Recommendation Statement also provided certain information about other sources of potential conflicts of interest.  Defendant Palmer was entitled to a golden parachute of $13.6 million upon the closing of the Transaction, and certain non-director executives were also entitled to golden parachutes.

131.   The Recommendation Statement also stated that "[t]o the best knowledge of the Company, except for certain agreements described in this Schedule 14D-9 between the Company and its executive officers and directors, no material employment, equity contribution or other agreement, arrangement or understanding between any executive officer or director of the Company, on the one hand, and Parent, Purchaser or the Company, on the other hand, exists as of the date of this Schedule 14D-9, and neither the tender offer nor the merger is conditioned upon any executive officer or director of the Company entering into any such agreement, arrangement or understanding."  Through this statement the Company affirmatively disclaimed the existence of any kickback arrangement or consulting agreement between any of the executive directors and Apollo.

### 6.   Plans to Tender Shares

132.   The Recommendation Statement contained a section titled "intent to tender" in which it stated that executive officer and directors owned about 26% of then-outstanding shares. It also stated that "to the Company's knowledge, after making reasonable inquiry" each executive officer and director "currently intends" to tender into the Transaction, except Defendant Cloobeck. The statement continued: "To the Company's knowledge, the chairman of the board of directors has not yet determined whether to tender or cause to be tendered all of his Shares."

### 7.   Appraisal Rights

133.   The Recommendation Statement also contained a section that accurately explained the appraisal rights of shareholders.  Under the law that applies to the internal affairs of Delaware

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   corporations, a shareholder may seek a determination of the true value of their shares from a court,

2   when a merger liquidates their shares.  As the Recommendation Statement explained, these rights

3   accrue when the merger is completed if, among other conditions, the shareholder did not

4   voluntarily tender their shares and if they made a timely demand for appraisal.  The purpose of the

5   appraisal procedure is to determine the true value of the shares which could be greater than, less

6   than, or the same as the merger price.  The shareholder seeking appraisal therefore bears

7   significant risk, both in terms of the costs of seeking appraisal and in terms of the possibility of

8   obtaining a lower price than was offered through the deal.  So, unless a shareholder has a reason to

9   believe the deal did not provide them with a true value for their shares, they would not have a

10  reason to exercise appraisal rights and pay the accompanying legal expenses and expert fees.

11

12      **H.      Apollo's Tender Offer Lacked Adequate Investor Support Until Defendant
                Cloobeck Tendered His Shares While Securing a Consulting Position from
13              Apollo**

14      134.    The Tender Offer was originally set to run from July 14, 2016 until August 10,

15  2016.  A few days after the tender offer started, on July 18, 2016 Defendant Cloobeck sent an

16  email from his personal email address to Apollo's Co-founder Marc Rowan to initiate discussions

17  concerning Defendant Cloobeck's potential employment by Apollo.

18      135.    On August 9, 2016, only 27.9% of the shares had been tendered—well below the

19  50% that would be needed to execute the Transaction.  Furthermore, this number actually

20  overstated the interest in this deal from non-insider shareholders, since it included each of the

21  insiders who owned 8.1% of the shares outstanding that were, at that time, intending to tender into

22  the deal.  This low level of investor interest meant that the deal was highly likely to fail unless

23  Defendant Cloobeck tendered his shares into the deal which represented 18.1% of outstanding

24  shares.  And, it meant that Defendant Cloobeck therefore held considerable leverage to get himself

25  additional personal consideration by negotiating with Apollo.

26

27

28

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

136.   On August 9, 2016, Defendant Cloobeck reached out to Apollo once again—informing them of the then-current vote total.  The deal did not get the interest needed to close—ending August 9, 2016, with only 27.96%—and the offer was extended for ten business days, to expire on August 24, 2016.  In concert with the extension of the Tender Offer, Diamond filed an amended Recommendation Statement on Schedule 14D-9, which "amend[ed] and supplement[ed]" the earlier filed Recommendation Statement.  The only amendments made related to the interest in and extension of the Tender Offer.

137.   Over a week later, on August 17, 2016, Defendant Cloobeck finally tendered his shares and tipped the total acceptance of the Tender Offer to just over 50%.  Just 14 days later, on August 31, 2016, Mr. Sambur, of Apollo, confirmed by email with another Apollo employee that Apollo was bringing Defendant Cloobeck on as a "consultant."  This fact was once again confirmed by a September 2, 2016, email – sent the day the deal closed – (which was first disclosed in the Delaware Litigation), in which Defendant Cloobeck emailed another Diamond employee saying he was hired as a consultant.

138.   The fact that Defendant Cloobeck had decided to tender his shares despite his earlier vociferous objections to the deal, and the fact that Apollo had hired him as a consultant concurrent with the time he changed course and tendered his shares were not publicly disclosed during the Class Period.

139.   However, as previously noted, previously undisclosed emails show that the decision to bring Defendant Cloobeck on as a consultant was in place well before the deal closed—and was clearly made contemporaneous with Defendant Cloobeck's decision to tender his shares, as additional consideration to Defendant Cloobeck in exchange for his shares.

140.   As was first disclosed in the Delaware Litigation, on September 12, 2016, an attorney named Daniel Mun, working for the law firm Paul, Weiss, Rifkind, Wharton & Garrison, sent an email to Apollo referring to a draft consulting agreement for Defendant Cloobeck with a

two-year term and a provision regarding an "extra 2.5 thousand per day" fee.   As described below, former Diamond employees clarify this situation.

141.    Confidential Witness 1 ("CW 1") worked in the Company's Las Vegas headquarters from the first quarter of 2016 until the first quarter of 2018 as a senior accountant and was supervised by Accounting Manager Kelly Whalen.  CW 1 was responsible for managing cash activity and managing certain administrative aspects of Diamond's accounting system, including booking and classifying accounting entries by project and entry type.

142.    CW 1 explained that both Defendant Cloobeck and Defendant Palmer had consulting agreements after the merger.  More specifically, CW 1 explained that during 2017, Diamond was making monthly six-figure wire payments to each of them.  CW 1 further explained that these payments were coded as a "depreciable project" and booked as "M&A activity."  CW 1 added that these were not booked this way because they were contracts to consult about M&A, but instead the consulting contracts were themselves "classified in the system [and on the balance sheet] as an M&A project."  In other words, according to CW 1, these fees were recorded as a cost Diamond incurred as part of past M&A activity.

143.    The clear conclusion from this witness's account is that Defendant Cloobeck had been paid to tender his shares and that the consideration he received for doing so was payments, which were booked as a "consulting contract" with the Company.

144.    Confidential Witness 2 ("CW 2") worked at Diamond's Las Vegas, Nevada headquarters from November 2008 to November 2016, as an Account Manager and was in charge of general and administrative fees, and CW2's responsibilities included making journal entries for cash payments in the Company's Oracle system.  CW 2 reported to Vice President of Financial Reporting, Judith Richardson.

145.    CW 2 learned of Defendant Cloobeck's consulting agreement with Apollo very soon after the Transaction was finalized from colleagues in the account department, who knew

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

about the agreement.  CW 2 also stated that soon after the Transaction, Defendant Cloobeck and his assistant vacated their offices at the Diamond headquarters.

146.    Confidential Witness 3 ("CW 3") worked at Diamond's Las Vegas, Nevada headquarters from January 2016 to July 2018, as a Global Training Manager.  CW 3 reported to the Vice President of Organizational Development Eva Esteban, who in turn reported to the Executive Vice President of Global Human Resources, Steven Bel.

147.    CW 3 first learned that Defendant Cloobeck would be returning to Diamond as a consultant soon after the merger was complete.  Furthermore, in 2017, CW 3 was instructed in writing by a Senior Vice President of Creative Services and Brand Communications, Stevi Wara, not to mention Defendant Cloobeck in any capacity to new hires because of legal issues or conflicts surrounding Defendant Cloobeck and Apollo.

## I.    Apollo Completes Acquisition of Diamond

148.    Despite having sufficient tender interest, at 58.9%, to close the Transaction as of August 17, 2016, Apollo chose to extend the offer yet again on August 24, 2016.  This time the offer was extended for four business days, until August 30, 2016.   In concert with the extension of the Tender Offer, Diamond filed an amended Recommendation Statement on Schedule 14D-9, which "amend[ed] and supplement[ed]" the earlier filed Recommendation Statement.  The only amendments made related to the interest in and extension of the Tender Offer.  The amendment did not update, correct, or disclose the information regarding Defendant Cloobeck's decision to tender and did not update, correct, or disclose the sections of the Recommendation Statement that claimed all material employment agreement had been disclosed – notably omitting the fact that Defendant Cloobeck had been retained as a consultant, simultaneous with his decision to tender his shares.

149.    And again, on August 29, 2016, Apollo extended the offer another 2 business days, until September 1, 2016.  At the time of this final extension, Apollo already had a tender interest

of 62.49% of the shares outstanding.  Once again, Diamond issued an amended Recommendation Statement regarding the extension without mention of Defendant Cloobeck's decision to tender and without mention of his consulting agreement.  There was simply no excuse to not update the earlier statements that were rendered directly false due to Defendant Cloobeck's decision to accept the Tender Offer and his consulting agreement, especially given the fact that the Company was publishing amendments to the Schedule 14D-9.

150.   On September 2, 2016, Diamond disclosed in another amended Schedule 14D-9 that at 5:00 P.M. EST on September 1, 2016, the tender offer expired and was not extended. Diamond stated that, as of the expiration time of the tender offer, a total of 56,675,355 shares (or approximately 81.26% of the then-outstanding shares) were validly tendered into and not withdrawn from the tender offer.

151.   On September 2, 2016, having exceeded the 50% level of ownership necessary to consummate the transaction's back-end merger without a stockholder vote, Apollo and Diamond consummated the merger.  The aggregate purchase price was approximately $2.2 billion dollars.

152.   Any shareholder who did not tender into the Tender Offer and who did not exercise appraisal rights had their interest in the Company liquidated through the merger at the same $30.25 price as the tendering shareholders.

153.   As a result of selling their shares for less than their true value shareholders were injured.  The true value of Diamond stock—whether measured in relation to the Company's intrinsic value or as measured in relation to the price shareholders would have received through a fair transaction—far exceeded the $30.25 deal price.

154.   The following table shows a timeline of certain key events related to the Offer:

[table on following page]

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

| Date of Event | Event | % Tendered | Expiration Date |
|---|---|---|---|
| June 29, 2016 | Merger agreement published | 0% | N/A |
| July 14, 2016 | Recommendation Statement & Tender Offer Published | 8.1%[22] | Aug. 10, 2016 |
| Aug. 9, 2016 | Amendment to Recommendation Statement Extending Tender Offer | 27.96% | Aug. 24, 2016 |
| Aug. 17, 2016 | Defendant Cloobeck Tenders Without Publicly Disclosing | 51.03%[23] | Unchanged |
| Aug. 24, 2016 | Amendment to Recommendation Statement Extending Tender Offer | 58.88% | Aug. 30, 2016 |
| Aug. 29, 2016 | Amendment to Recommendation Statement Extending Tender Offer | 62.49% | Sept. 1, 2016 |
| Sept. 2, 2016 | Tender Offer Expired and Merger Completed | 81.26% | N/A |

## J.    Related Litigation

155.    Following the closing of the Transaction, there were multiple legal proceedings filed in Delaware state court.

### 1.    Shareholders Seek Appraisal

156.    On September 20, 2016, three shareholders, holding approximately 1.2 million shares of Diamond Stock, filed an appraisal action in Delaware Chancery Court (the "Appraisal Action").[24]  By the end of September three additional appraisal suits had been filed, by 11 shareholders, holding approximately 5.6 million shares, and all of these suits were consolidated into the Appraisal Action.

157.    Petitioners in that action sought the fair value of their shares by having the court determine the intrinsic value of the Company at the time of the Merger.  In such a proceeding, the court may find that a company was overvalued in a merger leaving petitioners with less per share than the merger consideration.  For example, the shareholders seeking appraisal held a total of

---

[22] This number was determined based on the statement in the Recommendation Statement that each of the Company's insiders, other than Defendant Cloobeck, were tendering—and based on the disclosure that 26% of shares were held by insiders and of these 18.1% were held by Defendant Cloobeck.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

about 6.8 million shares at the time of the merger and if the court found the fair value of the Diamond stock was $3 per share less than the merger consideration (*i.e.*, $27.25), Apollo would have saved more than $20 million on those shares alone by not having to pay these investors the full $30.25 per share.[25]

158.    Through discovery in the Appraisal Action, the petitioners sought documents and communications related to the Transaction and Call Options held by Defendants Cloobeck and Palmer, and Mr. Kraff. Throughout the Appraisal Action, Diamond refused to produce relevant documents and missed discovery deadlines. As to Defendant Cloobeck individually, his counsel admitted that Defendant Cloobeck deleted emails in his custody relevant to the Transaction. Petitioner was forced to file many motions to compel and was forced to subpoena directors who were not parties to the Appraisal Action. The court partially granted the motions to compel.

159.    In particular, the court ordered discovery from Diamond, Apollo, Palmer, and Kraff as to potential employment, consulting agreements, and the Call Options for those individuals and Defendant Cloobeck. Due to the continued difficulties regarding discovery in this case, the court appointed a Special Master on January 31, 2018, to handle all discovery disputes in the case, despite the court granting multiple motions to compel throughout the proceeding.

160.    On March 2, 2018, the parties filed a stipulation to settle the case, the clear implication of which was that Diamond and Apollo would rather pay a settlement than comply with their discovery obligations and produce documents related to any co-investment opportunities or consulting agreements given to Defendants Cloobeck, Defendant Palmer, and Mr. Kraff. The stipulation requested a stay for the proceedings until the earlier of October 15, 2018 or the filing of a dismissal.

---

[23] This includes 19,499,074 shares (27.96%) tendered by August 9, 2016, Defendant Cloobeck's 12,629,000 shares (18.1%) tendered on August 17, and approximately 3,460,000 other shares (4.96%) tendered between August 9, 2016, and August 17, 2016.
[24] *Empyrean Capital Fund LP v. Diamond Resorts, Int'l, Inc.*, No. 12759 (Del. Ch. filed Sept. 20, 2016).
[25] While the shareholders petitioned Diamond in the appraisal, Apollo, as sole shareholder of Diamond, had the ultimate financial interest in the appraisal.

- 52 -

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

161.    On October 16, 2018, the parties filed a stipulation indicating they had entered into a settlement for an undisclosed amount.  The court granted the stipulation on October 19, 2018 and the case was dismissed with prejudice.

### 2.    Breach of Fiduciary Duties Suit

162.    About two months after the Transaction closed, on October 26, 2016, a shareholder named Stephen Appel brought a Breach of Fiduciary Duties Suit against the Board and against Centerview for aiding and abetting the directors' breaches of fiduciary duty (the "Breach of Fiduciary Duties Suit").[26]

163.    The complaint in the Breach of Fiduciary Duties Suit was heavily redacted, but from what could be gleaned from the public filing, the plaintiff believed that there had been an "ill-timed and conflict-laden transaction process that grossly failed to secure fair value for Diamond's shares."  A central conflict at issue therein was the conflicted relationship between the members of the Strategic Review Committee and Apollo – especially the previously described conflicts stemming from Defendant Taitz and the conflicts stemming from Centerview's past work on Apollo private equity deals.

164.    Defendants moved to dismiss and oral argument was held on the motions.  One of the arguments in the motion to dismiss was—in summary—that any problems with the deal were "cleaned" because it was approved by majority vote (through the Tender Offer) of fully informed shareholders.  As a result, there was occasion to discuss whether the shareholders were fully informed.  One of the major arguments made on that topic, by the plaintiff, was that the shareholders were not fully informed of Defendant Cloobeck's reasons for abstaining and of his opposition to the deal.  During this hearing, through counsel, Defendants Berkman, Daley, Del Papa, Jones, Palmer, Taitz, Warren, and Wolf each conceded that they knew the reasons for Defendant Cloobeck's abstention *at the time of the abstention*.  Specifically, their counsel said:

---

[26] *Appel v. Berkman*, No. 12844-VCMR (Del. Ch. filed Oct. 26, 2016).

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

"Of course the other directors knew why he abstained.  He said it at the two board meetings."  For his part, Defendant Cloobeck's argued, through his counsel, that: "Mr. Cloobeck completely disclosed to the board all of his concerns, the nature of his concerns.  The company was well aware of it."

165.    Vice Chancellor Tamika Montgomery–Reeves of the Delaware Court of Chancery issued an unpublished opinion addressing the motion to dismiss.[27]  The opinion, treating all allegations as true, considered several issues, including three potential disclosure failures—which would have undone the cleansing effect of a shareholder vote under Delaware state law.  One of these three disclosure failures was the allegation that the Recommendation Statement failed to "disclose the chairman and founder of Diamond, Stephen J. Cloobeck's 'disappointment' with the price and timing of the merger, as well as with 'the Company's management for not having run the business in a manner that would command a higher price.'"

166.    The vice-chancellor held that as a matter of Delaware law, the grounds for an abstention need not be disclosed.  The judge noted that the Recommendation Statement disclosed that Defendant Cloobeck had abstained and that he had not determined whether to tender his shares.  Because this disclosure failure was erroneously found to be immaterial as matter of law, and because the plaintiff's other arguments also failed, the motion to dismiss was granted.

167.    On August 11, 2017, the plaintiff in the Breach of Fiduciary Duties Suit appealed to the Delaware Supreme Court.  Within his opening appeal brief, the appellant quoted the actual language from the Board minutes citing Defendant Cloobeck's reason for abstaining.

168.    On February 20, 2018, Chief Justice Strine, Justice Valihura, and Justice Traynor of the Delaware Supreme Court reversed the Delaware Court of Chancery's decision to dismiss the Breach of Fiduciary Duties Suit.[28]  The core holding of that decision was that Defendant

---

[27] *Appel v. Berkman*, No. 12844-VCMR, 2017 WL 6016571, at *1 (Del. Ch. July 13, 2017), *rev'd,* 180 A.3d 1055 (Del. 2018).
[28] *Appel v. Berkman*, 180 A.3d 1055 (Del. 2018).

Cloobeck's views, as founder and Chairman, regarding the "wisdom of selling the company" were ones that "reasonable stockholders would have found material in deciding whether to vote for the merger or seek appraisal." The court also held that positive statements within the Recommendation Statement were "rendered . . . misleadingly incomplete" by the failure to disclose Defendant Cloobeck's views. The entire opinion is incorporated by reference herein, and several of its holdings include:

(a)   "Cloobeck's objections, which would have alerted stockholders to the possibility that a fair price might not have been obtainable at the time of the transaction, were omitted from the 14D-9 recommending that stockholders tender their shares."

(b)   The assertion in the Recommendation Statement that the Board "determined" that alternatives to the Transaction were "less favorable to the Company's stockholders than the transaction," was "directly at odds" with Defendant Cloobeck's undisclosed views.

(c)   The assertion in the Recommendation Statement that stockholders would "'receive a fair price in the merger, [was] materially misleading without an additional simultaneous, tempering disclosure'[29] that [Defendant] Cloobeck believed that this was 'a bad time to sell' and had expressed the reasons for that view to the board."

(d)   "For a Chairman to abstain from voting on the sale of the business he founded and led is no common thing, and when his reasons for doing so contradict the board's recommendations to the stockholders, it is difficult for us to understand how the omission was inadvertent."

(e)   "[T]he omitted facts are material and their omission precludes the invocation of the business judgment rule standard at the pleading stage."

---

[29] The Delaware Supreme Court is quoting the holding in *Gilmartin v. Adobe Resources Corp.*, No. 12467, 1992 WL 71510 (Del. Ch. Apr. 6, 1992).

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[30]

169.   During the Class Period, Defendants made numerous materially false and misleading statements and omissions.[31]

170.   Diamond made each of the statements described in this Section because they were filed by or on Diamond's behalf with the SEC.  Each of the Individual Defendants had ultimate control of the SEC filings described in this Section, this control is demonstrated, among other ways, because: (1) Defendant Finkelstein, Diamond's General Counsel and Corporate Secretary signed each of the SEC filings; (2) as Diamond's CEO, Defendant Palmer had direct control over what Diamond said in formal public filings—especially in filings as important as those described in this Section; (3) all of the Individual Defendants, except Defendant Finkelstein, were members of the Board, and therefore were in control of what Diamond said in formal public filings—especially in filings as important as those described in this Section; (4) the ultimate control of the Individual Defendants is further established by their involvement in the very activity described in these statements, which purport to detail the activity and opinions of the Individual Defendants as senior management of Diamond and members of the Board; (5) on February 29, 2016, Defendants Palmer signed a SOX certification for Diamond's 10-K, attesting to the strength of Diamond's internal controls, which controls necessarily ensure that the Individual Defendants, as Diamond's directors and senior management had control over Diamond's SEC filings; and (6) Defendants Berkman, Cloobeck, Daley, Finkelstein, Jones, Palmer, Taitz, Warren, and Wolf have each signed filings that were submitted to the SEC on Diamond's behalf.

171.   Additionally, many of the statements described in this Section were also made by the Individual Defendants, to the extent those statements were attributed to those defendants.  The statements that quote or cite Defendant Palmer were made by him.  The statements that purport to

---

[30] In this section, and throughout this complaint, the introductory headers are provided for convenience only.

describe the recommendations or opinions of the Board were made by or attributed to each of the

Individual Defendants, as Board Members (except Defendant Finkelstein) as each of them were

members of the Board.   The statements describing Defendant Cloobeck's decision to tender his

shares are also attributed to Defendant Cloobeck, because they purport to describe information he

had conveyed to the Company and has since admitted to conveying to the Company in the

Delaware Action.

### A.      Cloobeck's Opposition to the Merger

#### 1.      Statements on June 29, 2016

172.    On June 29, 2016, after the close of markets, Diamond and the Individual

Defendants (as explained in paragraph 170) made public statements through the filing of a Form

14D-9 with the SEC, which was signed by Defendant Finkelstein.   This filing contained a letter

from Defendant Palmer, which stated:

> "As you likely know, in February we announced that our Board of Directors was exploring strategic alternatives with the purpose of maximizing shareholder value. That review has been completed, and *we are pleased to announce that we have entered into a merger* agreement under which an affiliate of Apollo Global Management, LLC ("Apollo") will acquire Diamond Resorts. The transaction is currently expected to close in the fourth quarter of 2016.   The   press   release   may   be   viewed <u>here</u>."

173.    The press release referenced in paragraph 172, was filed a few minutes after the

Form 14D-9, as an attachment to a Form 8-K, this press release was made by Diamond and the

Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein.   The

press release stated that:

> *The Company's Board of Directors, acting upon the recommendation of its Strategic Review Committee (the "Strategic Review Committee"), approved and adopted the Merger Agreement and recommends that the Company's shareholders tender their shares in the offer pursuant to the Merger Agreement.*

---

[31] The statements that are ***bolded and italicized*** in this section are statements alleged to be false or misleading.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

174.     These statements in paragraphs 172-173 were false and misleading because they stated "we are pleased" to approve the transaction, in such a way as to indicate that "we" referred either to the Board, without also disclosing that Defendant Cloobeck was vocally opposed to the Transaction.  These statements also stated that the Board approved and recommended the Transaction, without disclosing that Defendant Cloobeck vocally opposed the Transaction and without even disclosing that he abstained from the Transaction.  More specifically, these statements omitted that on June 25, 2016, and June 26, 2016, Defendant Cloobeck voiced his opposition, stating that he was disappointed with the share price, that it was not the right time to sell, and that he would abstain from the vote for those reasons.

175.     Both the body of the Form 8-K, described in the paragraph 173, and a separate Form 14D-9 was filed the same day.  These filings were made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein.  They stated that:

> ***The Company's Board of Directors (the "Board"), acting upon the recommendation of its Strategic Review Committee (the "Strategic Review Committee"), determined that the transactions contemplated by the Merger Agreement, including the Offer and the Merger, are fair to and in the best interests of the Company and its stockholders, and approved the Merger Agreement and the transactions contemplated thereby, and recommended that the stockholders of the Company accept the Offer and tender their Shares pursuant to the Offer.***

176.     This statement was false and misleading because the Merger was not fair and in the best interests of the Company because it deprived shareholders of the fair value of their shares, and moreover, these statements omitted that on June 25, 2016, and June 26, 2016, Defendant Cloobeck voiced his opposition to the deal, stating that he was disappointed with the share price, that it was not the right time to sell, and that he would abstain from the vote for those reasons.

## 2.    Statements on July 14, 2016

177.    The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and stated that during the June 25, 2016, Board meeting:

> *[U]pon the recommendation of the strategic review committee, the board of directors authorized Centerview and Gibson Dunn to negotiate a final merger agreement with Apollo at the $30.25 price per Share of Company Common Stock. The Company's chairman abstained from this vote.*

178.    The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and stated that during the June 26, 2016 Board meeting:

> *The board of directors approved the entry into the merger agreement and the consummation of the transactions contemplated thereby. The Company's chairman abstained from this vote.*

179.    The statements in paragraphs 177 and 178 were false and misleading because they omitted that the reason for Defendant Cloobeck's abstention on June 25, 2016, and June 26, 2016, was that he was opposed to the deal, specifically that he stated on both of those dates that he was disappointed with the share price, that it was not the right time to sell, and that he would abstain from the vote for those reasons.

180.    The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and stated that:

> *At a meeting held on June 28, 2016, after careful discussion and consideration, upon the recommendation of the strategic review committee, the board of directors (i) determined that it is fair to and in the best interests of the Company and its stockholders, and declared it advisable, to enter into the merger agreement and to consummate the transaction (including the tender offer and the merger) in accordance with the DGCL, (ii) approved the execution, delivery and performance by the Company of the merger agreement and the consummation by the Company of the transaction (including the tender offer and the merger) and*

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

*(iii) recommended that the Company's stockholders accept the tender offer and tender their Shares in the tender offer. All of the directors voted in favor of such resolutions with the exception of the Company's chairman, who abstained.*

181.    These statements were false and misleading because they stated that the "board of directors" approved the transaction, recommended that shareholders accept the Tender Offer, and/or determined that the transaction was "fair to and in the best interests of the Company and its stockholders" when, in fact, Defendant Cloobeck vocally opposed the Transaction.  It was also materially misleading to merely state that Defendant Cloobeck "abstained," without also disclosing his opposition to the Transaction, because this statement did not accurately depict the event that had occurred.

182.    The omissions and misstatements regarding Defendant Cloobeck's opposition to the Transaction and the reasons for his opposition were obviously material, *inter alia*, because they hid Defendant Cloobeck's opposition to the merger, and overstated the support Diamond's Board gave to the Transaction, and because investors were deprived of information about Defendant Cloobeck's stated reasons for rejecting the merger, namely that management had not run the business in a manner that would command the highest price and that it was not the right time to sell the Company.

**B.    Reasons for Approving the Transaction**

183.    The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and included a section titled "Reasons for Recommendation."  Within that section, it was stated that one of the material factors considered when evaluating the possible Transaction was:

*[T]he review of possible strategic and financial alternatives to a sale of the Company conducted by the strategic review committee and the board of directors prior to the entry into the merger agreement, including the possibility of continuing as an independent public company, capital structure optimization or*

> *pursuing other business combinations, which the strategic review committee and the board of directors evaluated with the assistance of Centerview and determined were less favorable to the Company's stockholders than the transaction in light of the potential risks, rewards and uncertainties associated with those alternatives*[.]

184.   This statement was false and misleading because it was untrue that the board of directors "determined" that alternative transactions or staying independent was "less favorable to the Company's stockholders" than the Transaction, given that Defendant Cloobeck opposed the Transaction and stated that he was disappointed with the price and did not believe it was the right time to sell the Company.  These false and misleading statements were obviously material because they hid Defendant Cloobeck's opposition to the merger, and overstated the support Diamond's Board gave to the Transaction, and because it deprived investors of information about Defendant Cloobeck's stated reasons for rejecting the merger.  Moreover, this statement was false and misleading because it omitted Centerview's earlier DCF analysis, which valued the Company at a much higher price than the sale price.

185.   The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and included a section titled "Reasons for Recommendation."  Within that section, it was stated that one of the material factors considered when evaluating the possible Transaction was:

> *[T]he fact that the resolutions approving the merger agreement and the transaction were recommended by the strategic review committee, which is comprised of four independent directors, and approved by the board of directors, which is comprised of eight out of nine directors who are not officers of the Company or any of its subsidiaries, and the strategic review committee and the board of directors retained and received advice from Centerview, an experienced financial advisor, and outside legal counsel, Gibson Dunn, in evaluating, negotiating and recommending the terms of the merger agreement[.]*

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

186.     This statement was false and misleading because it stated that the "board of directors" approved the transaction when Defendant Cloobeck vocally opposed the Transaction. These false and misleading statements were obviously material because they hid Defendant Cloobeck's opposition to the merger, and overstated the support Diamond's Board gave to the Transaction, and because it deprived investors of information about Defendant Cloobeck's stated reasons for rejecting the merger.  Moreover, this statement was false and misleading because it omitted Centerview's earlier DCF analysis which valued the Company at a much higher price than the sale price.

187.     The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and included a section titled "Reasons for Recommendation."  Within that section it was stated that:

> *The foregoing discussion of the factors considered by the strategic review committee and the board of directors is not intended to be exhaustive, but rather includes the principal material positive factors and material negative factors considered by the strategic review committee and the board of directors.*

188.     This statement was false and misleading because the forgoing discussion had not included the "principal material positive factors and material negative factors considered by the . . . [Board]," given that the factors described did not include any mention of Defendant Cloobeck's opposition to the Transaction or his stated beliefs that the price was disappointing, that management had not run the company in a way that would command an optimal return, and that it was not the right time to sell the Company.  These false and misleading statements were obviously material because they hid Defendant Cloobeck's opposition to the merger, and overstated the support the Board gave to the Transaction, and because it deprived investors of information about Defendant Cloobeck's stated reasons for rejecting the merger.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

189.   The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and included a section titled "Reasons for Recommendation." Within that section it was stated that: "*the board of directors collectively reached the conclusion to approve the transaction*."

190.   This statement was false and misleading when made because it failed to state that Defendant Cloobeck was withholding his shares because he thought it was a bad deal. These false and misleading statements were obviously material because they hid Defendant Cloobeck's opposition to the merger, and overstated the support Diamond's Board gave to the Transaction, and because they deprived investors of information about Defendant Cloobeck's stated reasons for rejecting the merger.

## C.   Defendant Cloobeck's Decision to Tender His Shares

191.   The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and stated that: "*[t]o the Company's knowledge, the chairman of the board of directors has not yet determined whether to tender or cause to be tendered all of his Shares.*"

192.   This statement was false and misleading when made because it failed to state that Defendant Cloobeck was withholding his shares because he thought it was a bad deal. These false and misleading statements were obviously material because they hid Defendant Cloobeck's opposition to the merger, and overstated the support Diamond's Board gave to the Transaction, and because it deprived investors of information about Defendant Cloobeck's stated reasons for rejecting the merger.

193.   Then, on August 17, 2016, while simultaneously negotiating a consulting deal with Apollo, Defendant Cloobeck did a complete about-face and agreed to tender his shares in order to tip the balance of shareholders tendering to just over 50%.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

194.     On each of August 24, 2016, August 29, 2016 and September 2, 2016, Diamond filed an amendment and supplement to its Recommendation Statement as a Schedule 14D-9/A, each of which made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, and failed to disclose that Defendant Cloobeck had accepted the Tender Offer and decided to tender his shares.  This was at direct odds with the statement made in the earlier Registration Statement that: "*[t]o the Company's knowledge, the chairman of the board of directors has not yet determined whether to tender or cause to be tendered all of his Shares.*"  Defendants had a duty to disclose this information to make this statement not misleading.

195.     On each of these dates, it was false and misleading to file an amendment to the Recommendation Statement without disclosing that Defendant Cloobeck had, by that time, accepted the Tender Offer and decided to tender all of his shares to Apollo.  The omissions and misstatements regarding Defendant Cloobeck's decision to tender his shares were obviously material, *inter alia*, because, by publishing the percentage of shares tendered (in each of the amendments to the Recommendation Statement), without disclosing that this number **included** Defendant Cloobeck's shares, these amendments grossly overstated the level of interest in the Transaction among non-investors.  This information was highly significant to other investors, since greater unaffiliated investor interests is a signal that the deal is desirable, and because (more generally) hiding this information deprived investors of information that could have informed their analysis of whether the sale process had resulted in a price that represented the fair value of their shares.

### D.     Defendant Cloobeck's Consulting Agreement

196.     During the deal process, the market was unaware that Defendant Cloobeck was negotiating a lucrative consulting deal with Apollo, and while negotiating that deal, agreed to tender his shares in direct contravention of his earlier objection to the fairness of the deal.  On July

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

18, 2016, Defendant Cloobeck sent an email from his personal email address to Apollo's Co-founder Marc Rowan to initiate discussions concerning his potential employment by Apollo. On August 9, 2016, Defendant Cloobeck reached out to Apollo once again—informing them of the then-current vote total (which was less than 50%). Over a week later, on August 17, 2016, Defendant Cloobeck finally tendered his shares. On August 31, 2016, Mr. Sambur, of Apollo, confirmed by email with another Apollo employee that Apollo was bringing Defendant Cloobeck on as a "consultant." On September 2, 2016—the same day the deal closed—Defendant Cloobeck sent an internal email within Diamond announcing that Apollo had offered him a consulting role. Defendant Cloobeck was hired as a consultant at or around the same time he agreed to tender his shares and this fact was not disclosed to investors during the Class Period.

197.    The Recommendation Statement, which was made by Diamond and the Individual Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on July 14, 2016, and stated that:

> To the best knowledge of the Company, except for certain agreements described in this Schedule 14D-9 between the Company and its executive officers and directors, *no material employment, equity contribution or other agreement, arrangement or understanding between any executive officer or director of the Company, on the one hand, and Parent, Purchaser or the Company, on the other hand, exists as of the date of this Schedule 14D-9, and neither the tender offer nor the merger is conditioned upon any executive officer or director of the Company entering into any such agreement, arrangement or understanding.*

198.    This statement was false and misleading at the time the amendments to the Registration Statement were made (August 24, 2016, August 29, 2016 and September 2, 2016), because Defendant Cloobeck entered into a consulting agreement with Apollo at or around the time he tendered his shares (August 17, 2016), and/or had an "understanding" with Apollo at or around the time he tendered his shares. The consulting agreement was not disclosed in the amendments to the Registration Statement and was a material agreement, arrangement or

understanding between a director of the Company and either the Company or Apollo.  The

omissions and misstatements regarding Defendant Cloobeck's consulting agreement were

obviously material, *inter alia*, because they understated Apollo's interest in Diamond and hid

information that suggested a corrupt and conflicted deal process.

### E.   Centerview's Earlier DCF Analysis

199.   The Recommendation Statement, which was made by Diamond and the Individual

Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on

July 14, 2016, and included a summary of Centerview's Fairness Opinion is included, which

stated:

> ***Centerview performed a discounted cash flow analysis of the
> Company***. A discounted cash flow analysis is a traditional
> valuation methodology used to derive a valuation of an asset or set
> of assets by calculating the "present value" of estimated future
> cash flows of the asset or set of assets. "Present value" refers to the
> current value of future cash flows or amounts and is obtained by
> discounting those future cash flows or amounts by a discount rate
> that takes into account macroeconomic assumptions and estimates
> of risk, the opportunity cost of capital, expected returns and other
> appropriate factors.

200.   This statement was false and misleading because Centerview actually performed

multiple DCF analyses (one immediately preceding the Fairness Opinion and one that was part of

its slide deck that was presented on January 16, 2016), and, therefore, it was false and misleading

to hide this earlier DCF analysis and state that it had performed "a" (just one) discounted cash

flow analysis.  Moreover, it was false because it omitted that on January 16, 2016, the same day

that Apollo first approached Diamond about a potential deal, Centerview presented a slide deck

showing a range of $39.85 to $53.50 a share.  The earlier higher valuation was obviously material,

*inter alia*, because it showed that Diamond was worth far more than the $30.25 per share offered

by Apollo through the Transaction and because its revelation would have provided investors

context and basis to doubt the credibility of Centerview's later opinions and valuations.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

**F.     Apollo Approached Diamond About a Transaction**

201.    The Recommendation Statement, which was made by Diamond and the Individual

Defendants (as explained in paragraph 170), and signed by Defendant Finkelstein, was filed on

July 14, 2016, and stated that:

> On February 24, 2016, the Company announced publicly results
> for the fourth quarter and full year ended December 31, 2015 and
> that it was exploring strategic alternatives. *Following this*
> *announcement, Centerview and the Company's management*
> *received inbound calls from certain strategic and financial*
> *parties, including Apollo.*

202.    This statement was false and misleading because it stated that Apollo made

"inbound calls" to Diamond's management *after* the announcement on February 24, 2016, which

created the false impression that Apollo had not already indicated its interest in a potential

transaction prior to the announcement on February 24, 2016.  In fact, Apollo had expressed

interest on January 16, 2016.  The omissions and misstatements regarding the timing of Apollo's

interest in Diamond was obviously material, *inter alia*, because they misleadingly distorted the

timeline of events in a way that downplayed Apollo's interest in Diamond, downplayed the

significance of the various relationships Defendant Taitz, Defendant Jones, and Centerview had

with Apollo, and downplayed the advantage Apollo had over other potential acquirers, with

respect to assessing the Transaction, and, in particular, downplayed the significance of denying

Reverence Capital the 30-45 days that it stated would be necessary for it to complete diligence

before it could submit a final bid.

**VII.    ADDITIONAL ALLEGATIONS REGARDING OMISSIONS**

203.    As a Delaware Corporation and as Board members and senior management thereof,

Defendants had affirmative obligations to provide shareholders with adequate information prior to

the Transaction.  Additionally, pursuant to Section 14 of the Exchange Act and SEC rules

promulgated thereunder, Defendants had an obligation to file the Recommendation Statement in

accordance with SEC rules and regulations, *see* 15 U.S.C. § 78n(d)(4), and to file a Schedule

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  14D-9 Recommendation Statement in compliance with all SEC requirements.  Such requirements

2  included an obligation to disclose whether directors were tendering their shares, an obligation to

3  disclose any other information necessary to make that disclosure not materially misleading, and an

4  obligation to update the Schedule 14D-9 Recommendation Statement upon any material change in

5  the information therein.

6      204.    In contravention of their affirmative obligation to disclose information, Defendants

7  omitted to disclose: (1) the fact of Defendant Cloobeck's opposition to the Transaction and his

8  stated reasons for opposing the Transaction; (2) Defendant Cloobeck's decision to tender his

9  shares; (3) Defendant Cloobeck's consulting agreement; (4) the higher DCF analysis presented by

10  Centerview on January 16, 2016; (5) the fact that Apollo approached Diamond on January 16,

11  2016.  Each of these omissions were material for the same reasons that the statements related

12  misstatements described in paragraphs 182, 195, 198, 200, and 202, respectively, were materially

13  misleading.

## VIII.   ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER

15      205.    As described below, the Individual Defendants had actual knowledge that the

16  statements and omissions made by them were false and misleading, or acted with reckless

17  disregard for the truth or falsity of those statements and omissions.  The Individual Defendants'

18  intent to deceive, or reckless disregard for the truth, is demonstrated by admissions and substantial

19  direct and circumstantial evidence supporting a strong inference of scienter.  Furthermore,

20  Defendants Cloobeck, Palmer, Taitz and Jones all had the motive and opportunity to defraud

21  investors, as did non-Defendant Mr. Kraff.

### A.    Defendant Cloobeck's Opposition to the Transaction and the Board's
        Purported Reasons for Approving the Transaction

26      206.    All Defendants knew of the omissions and misleading statements related to

27  Defendant Cloobeck's opposition to the Transaction and the Board's purported reasons for

28  approving the Transaction.

207.    All Defendants were present during the June 25, 2016, and June 26, 2016, Board meetings where Defendant Cloobeck stated his opposition to the Transaction and abstained from voting in favor of the Transaction.  In particular, each of the Individual Directors were described as attending the Board meetings where Defendant Cloobeck voiced his opposition, as indicated by the statements in the Recommendation Statement that the "full board" participated in the meetings "as well as the Company's senior management," which would include Defendant Finkelstein.

208.    Additionally, Defendant Taitz received an email from Defendant Cloobeck on May 14, 2016, in which Defendant Cloobeck voiced his opposition to the Transaction, saying, "I wouldn't do this."  Furthermore, during the June 8, 2017, oral argument for the motion to dismiss in the Breach of Fiduciary Duties Suit, through counsel, Defendants Berkman, Daley, Del Papa, Jones, Palmer, Taitz, Warren, and Wolf each *admitted* that they knew the reasons for Defendant Cloobeck's abstention at the time he abstained during the Class Period.  Specifically, their counsel said: "Of course the other directors knew why he abstained.  He said it at the two board meetings." For his part, Defendant Cloobeck's argued, through his counsel, that: "Mr. Cloobeck completely disclosed to the board all of his concerns, the nature of his concerns.  The company was well aware of it."

209.    Each of the Defendants had access to and control over the contents of the Recommendation Statement and amendments which attribute the ultimate recommendation of the deal to the Board, and therefore knew or were reckless in not knowing the document never disclosed that Defendant Cloobeck opposed the transaction or Defendant Cloobeck's reasons for opposing the Transaction.

**B.    Centerview's Earlier DCF Analysis**

210.    Each of the Individual Defendants, except Defendant Del Papa, knew or were reckless in not knowing of the omissions and misleading statements related to Centerview's earlier DCF analysis.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

211.   On January 16, 2016, Centerview presented a slide deck regarding Diamond's valuation with a DCF analysis showing a value of between $39.85 and $53.50 a share.  Because of this presentation, and because of their roles as Diamond's senior management and Board members at the time, each of these Individual Defendants either saw the valuation or had access to the valuation materials.

212.   Each of the Individual Defendants had access to and control over the contents of the Recommendation Statement and amendments which attribute the ultimate recommendation of the deal to the Board and knew or were reckless in not knowing that the higher valuation was omitted from that statement.

**C.    Apollo Approaching Diamond**

213.   Each of the Individual Defendants, except Defendant Del Papa, knew or were reckless in not knowing of the omissions and misleading regarding the timing of Apollo's interest in Diamond.

214.   As first disclosed in the Delaware Litigation, and as memorialized in a June 20, 2016 internal Apollo Memo: David Sambur of Apollo, "approached [Diamond's] management team in early January regarding a take private transaction."  The Individual Defendants, as directors and senior management of Diamond, would have known or would have been reckless in not knowing about one of the world's largest private equity firm approaching the Company regarding a potential transaction—and Defendant Palmer, as CEO of the Company would undoubtedly have been directly involved with this issue.

215.   Each of the Defendants had access to and control over the contents of the Recommendation Statement and amendments which attribute the ultimate recommendation of the deal to the Board, and knew or were reckless in not knowing that the fact that Apollo approached Diamond in early January 2016 was omitted from that statement.  Each of the Individual Defendants also knew or were reckless in not knowing that the Recommendation Statement

1    misleadingly stated that Apollo made inbound calls only after the Company publicly announced a

2    sale process in February 2016.

3         **D.    Defendant Cloobeck's Acceptance of the Tender Offer**

4         216.    Defendant Cloobeck knew of the omissions and misleading statements related to

5    his decision to accept the Tender Offer. As of August 17, 2016, when Defendant Cloobeck

6    tendered his shares, he knew that he had decided to tender his shares.

7         217.    Additionally, each of the Individual Defendants knew or were reckless in not

8    knowing of Defendant Cloobeck's decision to tender his shares on August 17, 2016, given that

9    this decision tipped the vote total to over 50% and, therefore, was of extraordinary importance to

10   Diamond and to the Board.

11        218.    Each of the Individual Defendants had access to and control over the contents of

12   the Recommendation Statement and amendments. Each of the Individual Defendants knew or

13   were reckless in not knowing that the amendments did not disclose that Defendant Cloobeck had

14   decided to tender his shares.

15        **E.    Defendant Cloobeck's Consulting Position**

16        219.    Defendant Cloobeck knew of the omissions and misleading statements related to

17   his post-Transaction consulting agreement. Defendant Cloobeck knew that, while having the

18   power to make or break the deal, he had reached out to Apollo about employment opportunities.

19   He also knew that he had secured a highly lucrative consulting position from Apollo at the same

20   time he tendered his shares, tipping the scales in favor of the deal, before the close of the

21   Transaction.

22        220.    Defendant Cloobeck had access to and control over contents of the

23   Recommendation Statement and amendments and knew or was reckless in not knowing that it had

24   not disclosed his consulting position, while purporting to disclose all such agreements.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

**F.     Several of the Defendants had the Motive and Opportunity to Defraud Investors**

**1.     Defendant Cloobeck**

221.    Defendant Cloobeck had incentives that were different from other shareholders. He held millions of shares in Company options that were expiring on July 21, 2016, shortly after the Recommendation Statement was published. Thus, while Defendant Cloobeck vocally opposed the deal, he also had incentives to allow the deal to proceed, notwithstanding this opposition. Furthermore, Defendant Cloobeck had incentives to behave in such a way as to extract a lucrative consulting contract from Apollo. Furthermore, the Transaction also offered him a unique opportunity to liquidate his position in Diamond.[32] More specifically, he received over $382 million for his shares, including the shares from the Call Options, according to the Recommendation Statement, which amounted to over $205 million in gains from the value of the IPO value of the shares.[33]

222.    Finally, by abstaining from the vote and *not* tendering his shares, Defendant Cloobeck preserved another potential opportunity to greatly enrich himself. If the Tender Offer obtained sufficient interest that it was going to pass the 50% threshold even without his support, he could have personally sought appraisal to obtain the true value of his shares. However, by August 17, 2016, it appeared that the Transaction would fail to reach 50% support without his shares. At that point he tendered and—the evidence indicates—he did so in exchange for the consulting agreement.

[32] Unlike other shareholders, Defendants Cloobeck and Palmer, with their large share blocks and insider status, would face serious obstacles to selling without driving down the price of Diamond stock, because such sales—outside of a major corporate transaction—would be interpreted by the market as a negative signal about the Company's prospects.

[33] This analysis is based on the assumption that Defendant Cloobeck held 17,925,710 shares (excluding those shares held through 1818 Partners) as of the IPO, and that by the time of the Transaction, he held 12,629,387 shares—thus on an estimated 12,629,387 shares Defendant Cloobeck recognized gains of $205,227,539 (i.e., the difference between the $14 IPO price and the $30.25 deal price).

- 72 -

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

### 2.    Defendant Palmer

223.    Defendant Palmer had incentives that were different from other shareholders.  He held millions of shares in Company options that were expiring on July 21, 2016, shortly after the Transaction was announced.  In fact, he corresponded by text message with Mr. Kraff regarding his incentive to get a deal done - just in time to exercise his options for maximum personal benefit.  He also had millions of dollars of equity awards that would vest upon completion of the Transaction as well as a $12,000,000 cash golden parachute.  Furthermore, Defendant Palmer had incentives to behave in such a way as to receive a lucrative consulting contract from Apollo, and in fact, he did receive an offer to continue with Apollo as CEO after the Transaction—and eventually was retained as a consultant.  Furthermore, the Transaction also offered him a unique opportunity to liquidate his position in Diamond,[34] more specifically, he received over $149 million for his shares, including the shares from the Call Options, according to the Recommendation Statement, which amounted to over $80 million in gains from the value of the IPO value of the shares.[35]

### 3.    Defendant Taitz

224.    Defendant Taitz has admitted to having serious conflicts with Apollo, including a personal relationship with two of Apollo's co-founders and history of service on the boards of twelve Apollo affiliated companies, which was very lucrative to Defendant Taitz personally.  She had a strong conflict of interest with respect to Apollo, due both to her friendship with Apollo's co-founders and for the financial benefits associated with continued board service on Apollo affiliated companies.  Therefore, she had an incentive and motive to avoid disclosing information that would have risked harming Apollo by impeding their ability to buy Diamond stock at an unfairly low price.

---

[34] *See* note 32.

[35] This analysis is based on the assumption that Defendant Palmer held 5,203,480 shares (excluding those shares held through 1818 Partners) as of the IPO, and that by the time of the Transaction, he held 4,932,436

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

#### 4.     Defendant Jones

225.     Defendant Jones had a history of service as the CFO with two Apollo affiliated companies.  He therefore had a financially lucrative personal relationship with Apollo and an incentive to avoid disclosing information that would have risked harming Apollo by impeding their ability to buy Diamond stock at an unfairly low price.  Roughly a year after the Transaction was completed, Apollo acquired ClubCorp and appointed Defendant Jones to its board of directors.

### IX.    LOSS CAUSATION

226.     Defendants' misrepresentations and omissions caused Lead Plaintiffs and the other members of the class to sell their Diamond shares at less than their true value.  The price at which they were induced to sell did not reflect the fair value of Diamond stock because it did not reflect the intrinsic value of Diamond's business and did not reflect the value class members would have received through an adequate sale process.

227.     The public filings on June 29, 2016, the Recommendation Statement, the amendments to the Recommendation Statement, and the omissions, were each an essential link in the completion of the Transaction.  Directors and Officers of Diamond controlled only 26% of Diamond and the Transaction required at least 50% of shareholders (or at least an additional 24% of shareholders in additional to the insiders) to tender their shares.  Apollo did not hold any Diamond stock prior to completing the Transaction.

228.     Had Defendants made truthful disclosures, Lead Plaintiffs and the other members of the class would not have sold their shares at less than the fair value of those shares.  Each piece of information withheld from Lead Plaintiffs and the other members of the class and each misleading statement made to Lead Plaintiffs and the other members of the class indicated that the true value of Diamond's shares was greater than it otherwise purported to be.

shares—thus on an estimated 4,932,436 shares Defendant Palmer recognized gains of $80,152,085 (i.e., the difference between the $14 IPO price and the $30.25 deal price).

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

229. The intrinsic value of Diamond stock exceeded the $30.25 deal price, as indicated by various factors that were not known to investors during the Class Period, as detailed in Section VI, such as: (1) defendant Cloobeck's vocal opposition to the deal at the $30.25 price; (2) the conflicted and improperly motivated deal process, which undervalued the company; (3) weaknesses in the deal process, such as failing to give competing bidders adequate time to assess the true value of the Company; (4) the fact that Apollo's interest in Diamond was greater than publicly disclosed, as indicated by the fact that it approached Diamond about a transaction prior to Diamond's formation of the Strategic Review Committee and as indicated by its willingness to pay additional consideration to close the deal at the $30.25 price, including the consulting agreement given to Defendant Cloobeck; (5) the DCF range presented by Centerview on January 16, 2016, which valued Diamond stock at $39.85 to $53.50; and (6) the low degree of investor support for the Tender Offer at the $30.25 price.

230. The significance of these undisclosed factors as indicative of a true value greater than $30.25, is further emphasized by the totality of the public information about Diamond, which includes the following factors indicating a high true valuation:[36] (1) Diamond's quarters of record financial performance throughout 2014, 2015 and 2016; (2) the fact that $30.25 was the absolute bottom of the valuation range from the DCF analysis Centerview presented when rendering its Fairness Opinion regarding the Transaction, which range extended from $30.25 to $45.20 per share; (3) analyst valuations throughout 2016, including valuations from Credit Suisse, J.P. Morgan, SunTrust Robinson, projecting a price for Diamond exceeding $30.25; (4) that the Company, with access to troves of non-public information, repeatedly asserted prior to the June 29, 2016, announcement of the Transaction, that the price of Diamond's stock was below its intrinsic value; and (5) that, contrary to the belief of some members of the public (such as short

---

[36] Had investors been able to assess this public information, in conjunction with what was hidden from the public, they would have been able to assess that the true value of their Diamond stock exceeded $30.25.

1  sellers) that the Company was subject to legal or regulatory investigation that would severely

2  injure the enterprise, in fact, no such regulatory action materialized.

3      231.    Finally, the fact that Diamond's intrinsic value was higher than the $30.25 deal

4  price is also emphasized by the fact that the Appraisal Action resulted in Diamond paying

5  shareholders a settlement amount, which would tend to indicate their appraisal had merit.

6      232.    Lead Plaintiffs believe that substantial additional evidentiary support exists to

7  demonstrate that the intrinsic value of Diamond's stock exceeded the $30.25 deal price, and that

8  this will be revealed after Lead Plaintiffs have a reasonable opportunity to conduct discovery.

9

10  **X.    APPLICATION OF THE PRESUMPTION OF RELIANCE**

11      233.    To the extent that reliance is an element of their claims, Lead Plaintiff and the

12  Class Members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v.

13  *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are

14  predicated upon omissions of material fact where there was a duty to disclose material

15  information.

16      234.    To the extent that reliance is an element of their claims, Lead Plaintiffs and the

17  Class Members are also entitled to a presumption of reliance on Defendants' material

18  misrepresentations and omissions pursuant to the fraud-on-the-market theory:

19          (a)    Diamond stock was actively traded on the NYSE, an informationally

20  efficient market, throughout the Class Period;

21          (b)    Diamond stock traded at high volumes during the Class Period;

22

23          (c)    Diamond filed annual reports and routinely filed quarterly unaudited

24  financial reports with the SEC;

25          (d)    Diamond communicated with public investors by means of established

26  market communication mechanisms, including through regular dissemination of press releases on

27

28

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)     The market reacted promptly to public information disseminated by Diamond, for example, the market price of Diamond stock increased by 23.76% when the Transaction was announced on June 29, 2016.

(f)     Diamond stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the public marketplace;

(g)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Diamond stock and the terms of the Transaction; and

(h)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class sold Diamond stock between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had still not yet been revealed.

235.     Additionally, the deal price of $30.25 was announced as a premium over the market price on June 28, 2016, and thus the deal price itself relied on the integrity of the market price, and therefore, shareholders indirectly relied on the market price when relying on the deal price.

## XI.     NO SAFE HARBOR

236.     The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint. As the Company acknowledged within the Proxies, the Transaction was a "going private" transaction under the SEC rules governing such transactions and, therefore, the statements made in connection with the Transaction are not subject to the PSLRA's safe harbor. *See* 15 U.S.C.A. § 78u-5(b)(E). Furthermore, even if the statements

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

were not covered by this exemption, the statements at issue would not be protected by the

PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons,

including the following.

237.    First, Defendants' statements and omissions alleged to be false and misleading

relate to historical facts or existing conditions and, therefore, are not protected by the safe harbor.

Second, to the extent any of the false and misleading statements alleged may be characterized as

forward-looking, they were not adequately identified as "forward-looking" statements when made.

Third, any purported forward-looking statements were not accompanied by meaningful cautionary

language because risks that Defendants warned of had already come to pass, and any cautionary

language did not mention important factors of similar significance to those actually realized.

Fourth, to the extent that there were any forward-looking statements that were identified as such,

Defendants are liable because, at the time each of those forward-looking statements was made, the

speaker knew the statement was false when made.

## XII.    CLASS ACTION ALLEGATIONS

238.    Lead Plaintiffs bring this federal securities class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that sold

Diamond's publicly traded common stock during the period from June 29, 2016 to September 2,

2016, inclusive (the "Class Period"), and were damaged thereby, except as excluded below (the

"Class").  For the avoidance of doubt, the Class includes those who held Diamond stock on

September 2, 2016, and sold their common stock once it was "automatically cancelled and

converted into the right to receive [$30.25]" and were damaged thereby.

239.    Excluded from the Class are: (i) Defendants and Apollo; (ii) members of the

immediate family of any Individual Defendant; (iii) any person who was an officer or director of

Diamond or Apollo during the Class Period; (iv) any firm, trust, corporation, or other entity in

which any Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

240.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Diamond had approximately 70 million common shares outstanding, which common shares were actively traded on the NYSE.

241.    While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by Diamond and/or Apollo and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

242.    Lead Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' conduct in violation of the Exchange Act as alleged herein.

243.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

244.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether the statements made to the investing public during the Class Period contained material misrepresentations;

1    (c)    whether Defendants' statements omitted material facts that Defendants had

2    a duty to disclose;

3    (d)    whether Defendants' statements omitted material facts necessary in order to

4    make the statements made, in light of the circumstances under which they were made, not

5    misleading;

6    (e)    whether Defendants knew or recklessly disregarded that their statements

7    were false and misleading;

8    (f)    whether Defendants acted with the intent to defraud class members

9    regarding the true value of Diamond stock;

10

11    (g)    whether Defendants' fraudulent conduct depressed the price of Diamond

12    stock during the Class Period;

13    (h)    whether the Individual Defendants were controlling persons of Diamond;

14    (i)    whether reliance may be presumed pursuant to the fraud-on-the-market

15    doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United*

16    *States*, 406 U.S. 128 (1972); and

17    (j)    whether and to what extent the shareholders of Diamond suffered losses due

18    to Defendants' fraudulent conduct.

19

20    245.    A class action is superior to all other available methods for the fair and efficient

21    adjudication of this controversy because, among other things, joinder of all members of the Class

22    is impracticable.  Furthermore, because the damages suffered by individual Class members may be

23    relatively small, the expense and burden of individual litigation make it impossible for members of

24    the Class to individually redress the wrongs done to them.  There will be no difficulty in the

25    management of this action as a class action.

26

27

28

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

# COUNT I

### Violation of § 14(e) of the Exchange Act
### Against Defendants Diamond, Berkman,
### Cloobeck, Daley, Del Papa, Jones, Palmer,
### Taitz, Warren, and Wolf Based on Negligence

246.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

247.    Section 14(e) of the Exchange Act, 15 U.S.C. §78n(e), contains two distinct offenses.  This count arises out of the first of these offenses, which is stated in the following bolded text in Section 14(e).

> **"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading,** *or* to engage in any fraudulent, deceptive, or manipulative acts or practices, **in connection with any tender offer."**

248.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 14(e).

249.    Defendants made false and misleading statements of material facts, omitted to state material facts, which they had a duty to disclose, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including by disseminating false and misleading SEC filings on form 8-K and 14D-9 on June 29, 2016, and on the 14D-9 Recommendation Statement filed on July 14, 2016, and the subsequent amendments thereto on August 9, 2016, August 24, 2016, August 29, 2016, and September 2, 2016

250.    The false and misleading statements each deprived investors of material information, which information would have led reasonable investors to doubt that the $30.25 price offered through the Transaction provided a fair exchange relative to the true value of their

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Diamond shares.  The misrepresentations and omissions in the Recommendation Statement are material.

251.    By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware of this information or were at least negligent in not being so aware and knew or were at least negligent as to the possibility that the misrepresentations and omissions described herein were material and would mislead Lead Plaintiffs and members of the Class.

252.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Diamond stock, Lead Plaintiffs and other members of the Class sold Diamond stock at deflated prices and/or prices that did not reflect the true value of that stock during the Class Period.  By selling the Diamond stock at these prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' conduct.

253.    By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 14(e) of the Exchange Act.

## COUNT II

### Violation of § 14(e) of the Exchange Act
### Against All Defendants Based on Scienter

254.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

255.    Section 14(e) of the Exchange Act, 15 U.S.C. §78n(e), contains two distinct offenses.  This count arises out of the second of these offences, which is stated in the following bolded text in Section 14(e).

> "**It shall be unlawful** for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, *or* **to engage in any**

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

**fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."**

256.   Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 14(e).

257.   Defendants made false and misleading statements of material facts, omitted to state material facts, which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including by disseminating false and misleading SEC filings on form 8-K and 14D-9 on June 29, 2016, and on the 14D-9 Recommendation Statement filed on July 14, 2016, and the subsequent amendments thereto on August 9, 2016, August 24, 2016, August 29, 2016, and September 2, 2016.

258.   The false and misleading statements each deprived investors of material information, which information would have led reasonable investors to doubt that the $30.25 price offered through the Transaction provided a fair exchange relative to the true value of their Diamond stock.   The misrepresentations and omissions in the Recommendation Statement are material.

259.   By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware of this information or were reckless in not being so aware and knew or were reckless as to the possibility that the misrepresentations and omissions described herein were material and would mislead Lead Plaintiffs and members of the Class.

260.   In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Diamond stock, during the Class Period, Lead Plaintiffs and other members of the Class sold Diamond stock at deflated prices and/or did not reflect the true value of that stock

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

during the Class Period.  By selling the Diamond stock at these prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' conduct.

261.    By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 14(e) of the Exchange Act.

## COUNT III

### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

262.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

263.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

264.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

265.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

266.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who sold Diamond stock.

267.    Defendants did, and intended to, or were reckless as to the possibility that they would (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii)

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

artificially deflate and maintain the prices of Diamond stock; and (iii) cause Lead Plaintiffs and members of the Class to sell Diamond stock at artificially deflated prices.

268.    The Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

269.    The misrepresentations and omissions in the Recommendation Statement are material.

270.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Diamond stock, during the Class Period, Lead Plaintiffs and other members of the Class sold Diamond stock at a prices that were deflated prices and/or did not reflect the true value of that stock during the Class Period.  By selling the Diamond stock at these prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' conduct.

271.    By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

### Violation of § 20(a) of the Exchange Act
### Against All Individual Defendants

272.    Lead Plaintiffs repeats, incorporates, and realleges each of the allegations set forth above as if fully set forth herein.

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    273.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the

2    Individual Defendants.

3    274.    As alleged above, Diamond violated Section 14(e) of the Exchange Act by making

4    false and misleading statements and omitting material information in connection with a Tender

5    offer during the Class Period.

6    275.    As alleged above, Diamond violated Section 10(b) of the Exchange Act Rule 10b-5

7    promulgated thereunder by making false and misleading statements and omitting material

8    information in connection with the sale of Diamond stock and by participating in a fraudulent

9    scheme and course of business or conduct throughout the Class Period.

10    276.    As set forth above, the Individual Defendants were controlling persons of Diamond

11    during the Class Period, due to their senior management positions with the Company, positions on

12    the Board and significant control over the Company's stock.  Such positions meant that the

13    Individual Defendants had direct involvement and influence over the Company's day-to-day

14    operations.

15    277.    By virtue of the foregoing, the Individual Defendants had the power to influence

16    and control, and did influence and control, directly or indirectly, the decision-making of

17    Diamond, including the content of its public statements with respect to, among other things, the

18    Transaction, Recommendation Statement, and amendments thereto.

19    278.    By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiffs

20    and the members of the Class as controlling persons of Diamond in violation of Section 20(a) of

21    the Exchange Act.

22

23

24    **XIII.   PRAYER FOR RELIEF**

25    279.    WHEREFORE, Lead Plaintiffs respectfully pray for judgment against the

26    Defendants as follows:

27

28

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106

(a)     Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

(b)     Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)     Awarding Lead Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(d)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(e)     Granting such other and further relief as the Court deems just and proper.

## XIV.   JURY DEMAND

280.     Lead Plaintiffs demand a trial by jury of all issues so triable.

DATED:  December 17, 2018

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT

By_____
G. Mark Albright, Esq.
Nevada Bar No. 1394
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada  89106

**LABATON SUCHAROW LLP**
Carol C. Villegas
Jake Bissell-Linsk
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
          jbissell-linsk@labaton.com

1

**CERTIFICATE OF SERVICE**

2      I, G. Mark Albright, hereby certify that on December 17, 2018, I electronically filed the

3 foregoing document though the CM/ECF system, which will send notification of such filing to all

4 registered participants as identified on the Notice of Electronic Filing.  Parties may access this

5 filing through the Court's CM/ECF System.

Dated: December 17, 2018

6

7                            */s/ Barbara Clark*_____
                           An employee of Albright, Stoddard, Warnick

8                            & Albright

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 88 -

LAW OFFICES
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 SOUTH RANCHO DRIVE
LAS VEGAS, NEVADA 89106